UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| Peter Parnell, *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>School Board of Lake County,<br>Florida, *et al.*,<br><br>              Defendants. | Case No. 23-cv-381 (BJD) (PRL)<br><br>**PRELIMINARY INJUNCTIVE<br>RELIEF REQUESTED** |

## PLAINTIFFS PETER PARNELL, JUSTIN RICHARDSON, D.S., E.S., AND M.H.'S MOTION FOR PRELIMINARY INJUNCTION

Date:  June 21, 2023

Anna T. Neill
William J. Blechman
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
atn@knpa.com
wjb@knpa.com

Faith E. Gay
Lauren J. Zimmerman*
Max H. Siegel*
Nancy A. Fairbank*
Rachel Slepoi*
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
fgay@selendygay.com
lzimmerman@selendygay.com
msiegel@selendygay.com
nfairbank@selendygay.com
rslepoi@selendygay.com

*Counsel for Plaintiffs*

*(application for admission *pro hac
vice* forthcoming)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT ........................................................... 1

BACKGROUND ................................................................................ 3

    A.   The Author Movants Write *And Tango Makes Three* ................... 3

    B.   The State Passes H.B. 1557, Rooted in Discriminatory Animus ................................................................................ 4

    C.   The Lake County Defendants Restrict *Tango* from Its Target Audience Based Solely on the Book's Viewpoint ............... 6

LEGAL STANDARD ........................................................................ 8

ARGUMENT ................................................................................... 9

I.   Movants Are Likely to Succeed on the Merits ......................... 9

    A.   The Author Movants Are Likely to Succeed on the Merits of Their Viewpoint Discrimination Claim ........................... 9

    B.   The Student Movants Are Likely to Show That the Restriction of *Tango* Violates Their Right to Receive Information ................................................................... 14

II.   Movants Face Continuing Irreparable Harm from the Ongoing and Impending Injury to Their First Amendment Rights ................... 20

III.   An Injunction Ending an Unconstitutional Deprivation of Rights Would Be Equitable and in the Public Interest .................................... 22

CONCLUSION ................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
  557 F.3d 1177 (11th Cir. 2009)..................................................... 10, 16, 17, 19

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.,*
  901 F.3d 356 (D.C. Cir. 2018) ...................................................................... 11

*Arce v. Douglas,*
  793 F.3d 968 (9th Cir. 2015)........................................................................ 18

*Ark. Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998) ...................................................................................... 10

*Barrett v. Walker Cnty. Sch. Dist.,*
  872 F.3d 1209 (11th Cir. 2017)..................................................................... 10

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
  457 U.S. 853 (1982).................................................................................*passim*

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) ...................................................................................... 15

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ...................................................................................... 13

*Campbell v. St. Tammany Par. Sch. Bd.,*
  64 F.3d 184 (5th Cir. 1995).......................................................................... 15

*Complete Angler, LLC v. City of Clearwater,*
  607 F. Supp. 2d 1326 (M.D. Fla. 2009) ................................................. 22, 24

*Democratic Exec. Comm. v. Lee,*
  915 F.3d 1312 (11th Cir. 2019).................................................................... 23

*Elrod v. Burns,*
  427 U.S. 347 (1976) ...................................................................................... 20

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975) ...................................................................................... 13

*FF Cosmetics FL, Inc. v. City of Miami Beach,*
    866 F.3d 1290 (11th Cir. 2017)................................................................. 9, 20

*First Nat'l Bank of Bos. v. Belotti,*
    435 U.S. 765 (1978)........................................................................................ 23

*Frederick Douglass Found., Inc. v. District of Columbia,*
    531 F. Supp. 3d 316 (D.D.C. 2021)............................................................ 11

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936).........................................................................................9

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988).............................................................................. 16, 18, 20

*Joelner v. Village of Washington Park,*
    378 F.3d 613 (7th Cir. 2004)......................................................................... 22

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006)............................................................... 20, 23

*LaCroix v. Town of Fort Myers Beach,*
    38 F.4th 941 (11th Cir. 2022) ...................................................................... 22

*Members of the City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ....................................................................................... 11

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020)..............................................................*passim*

*Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.,*
    426 F.3d 617 (2d Cir. 2005) ......................................................................... 19

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.,*
    2022 WL 16985720 (N.D. Fla. Nov. 17, 2022) ........................................... 16

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992).......................................................................................... 14

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)......................................................................................... 13

*Right to Read Def. Comm. v. Sch. Comm.,*
    454 F. Supp. 703 (D. Mass. 1978) ............................................................... 16

iii

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020)................................................................... 20, 21

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................................................................... 9, 10

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010)................................................... 22

*Searcey v. Harris*,
888 F.2d 1314 (11th Cir. 1989)................................................... 18

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000)......................................................9

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ...................................... 20, 22, 23

*Stanley v. Georgia*,
394 U.S. 557 (1969) ...................................................................... 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ...................................................................... 14

*Virgil v. Sch. Bd.*,
862 F.2d 1517 (11th Cir. 1989)...................................... 16, 18, 19

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ...................................................................... 15

*Zukerman v. U.S. Postal Serv.*,
567 F. Supp. 3d 161 (D.D.C. 2021)............................................ 11

## Statutes

2022 Florida House Bill 1557....................................................*passim*

2023 Florida House Bill 1069................................................... 5, 6

Fla. Stat. § 1001.42(8)(c)(3) ..................................................... 2, 5

## Rules

Fed. R. Civ. P. 65(a) .................................................................. 1, 24

iv

Local Rule 6.02 ........................................................................................ 1, 24

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................*passim*

**Other Authorities**

Fla. H.R., recording of proceedings (Feb. 22, 2022),
  http://bit.ly/3Jm97rw ............................................................................6

Fla. S. Comm. on Appropriations, recording of proceedings
  (Feb. 28, 2022), http://bit.ly/43ZHfBq ........................................ 5, 6

Fla. S., recording of proceedings (Mar. 7, 2022),
  http://bit.ly/442voD3 ........................................................................ 5, 6

Judd Legum, *"Don't Say Gay": Florida schools purge library
  books with LGBTQ characters*, Popular Information (Jan. 5,
  2023), https://popular.info/p/dont-say-gay-florida-schools-purge
  [https://perma.cc/B7LZ-F6M6]. ...................................................... 11

Judd Legum, *Florida English teacher pushing book bans is openly
  racist and homophobic, students allege*, Popular Information
  (Jan. 9, 2023), https://popular.info/p/florida-english-teacher-
  pushing-book [https://perma.cc/2T9M-2X8Y] ................................4

Joshua Q. Nelson, *Florida school district bans book about real-life
  gay penguin relationship, citing Parental Rights law*, Fox
  News (Jan. 9, 2023), https://www.foxnews.com/media/florida-
  school-district-bans-book-about-real-life-gay-penguin-
  relationship-citing-parental-rights-law
  [https://perma.cc/SNV5-8XLK]...........................................................6

Kari Lavelle, *We Move the World* (2021) .................................................. 7, 12

Tomie dePaola, *A New Barker in the House* (2002) ................................... 7, 11

Matt de la Peña, *Milo Imagines The World* (2021) ................................... 7, 12

Jo Rippon, *Rise Up!: The Art of Protest* (2020)........................................ 7, 12

## <u>PRELIMINARY STATEMENT</u>

Injury to First Amendment rights is irreparable. For that reason, Plaintiffs Justin Richardson and Peter Parnell (together, the "Authors" or "Author Movants") and Plaintiffs D.S, E.S., and M.H. (together, the "Student Movants," and, together with the Author Movants, the "Movants") respectfully seek a preliminary injunction, pursuant to Fed. R. Civ. P. 65(a) and Local Rule 6.02, requiring Defendants the School Board of Lake County, Florida and Diane Kornegay (together, the "Lake County Defendants") to temporarily restore students' ability to access *And Tango Makes Three* ("*Tango*") regardless of grade level in Lake County public school libraries before the first day of school on August 10, 2023, and through the pendency of this action.[1]

The Author Movants wrote *Tango* to share with children a heartwarming true story about animals in the Central Park Zoo. *See* Richardson Decl. ¶¶ 5, 11; Parnell Decl. ¶¶ 5, 11. The book espouses a message of tolerance along with traditional family values of love, nurture, and parental responsibility. It has been lauded by numerous literary and educational groups, Richardson Decl. ¶ 12; Parnell Decl. ¶ 12, and has been read and adored by thousands of children—including, for years, in Lake County, Florida.

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Complaint, ECF No. 1.

But in or before December 2022, the Lake County Defendants invoked Florida's discriminatory 2022 House Bill 1557 to restrict access to *Tango* so that it is no longer available to students below the fourth grade. Gay Decl., Ex. D, at 1. H.B. 1557 prohibits classroom instruction on gender identity or sexual orientation. Fla. Stat. § 1001.42(8)(c)(3). The legislative record makes clear that the law is targeted at LGBTQ+ identity and designed to suppress any message of tolerance for LGBTQ+ individuals. This discriminatory animus underlies the Lake County Defendants' restrictions. Giving no justification but H.B. 1557, the Lake County Defendants restricted access to 40 books—each of which features themes of LGBTQ+ tolerance. *See* Gay Decl., Ex. C.

This restriction is a First Amendment violation of the highest magnitude. It strips the Authors of their right to speak to their audience based solely on the viewpoint of their speech. It strips the Student Movants of their right to access the information and ideas in *Tango* based solely on the book's viewpoint, for no legitimate pedagogical reason. Because *Tango* is a factually accurate, nonvulgar, non-obscene, age-appropriate work, *see* Richardson Decl. ¶ 9–11; Parnell Decl. ¶ 9–11; Gay Decl., Ex. A, there is no legitimate reason for the restriction on the book. Thus, Movants are likely to succeed on the merits.

The First Amendment injury to the Movants is ongoing and impending, and it is irreparable under well-settled constitutional principles and on the facts that, since December 2022, (1) the Authors have been and continue to be

unable to speak to their target audience and (2) the Student Movants have been and will be unable to access information and ideas contained in *Tango*. By contrast, the Lake County Defendants have no legitimate interest in continuing their unconstitutional restrictions or enforcing an unconstitutional statute. The public interest plainly favors protection of constitutional rights.

This Court should grant a preliminary injunction requiring the Lake County Defendants to restore students' ability to access *Tango* regardless of grade level in Lake County public school libraries before the first day of school on August 10, 2023, and throughout the pendency of this action.

## BACKGROUND

### A.    The Author Movants Write *And Tango Makes Three*

In 2005, Plaintiffs Justin Richardson and Peter Parnell authored *And Tango Makes Three*, a children's book that tells the true story of two penguins in New York City's Central Park Zoo. Richardson Decl. ¶¶ 5, 9; Parnell Decl. ¶¶ 5, 9. The two male penguins, named Roy and Silo, formed an enduring pair bond and, with the help of a conscientious zookeeper, adopted, hatched, and raised a chick named Tango. Richardson Decl. ¶¶ 6–7; Parnell Decl. ¶¶ 6–7. The book is intended to teach children about animal behavior and to share a message of tolerance for varied family structures. *See* Richardson Decl. ¶¶ 11, 14–15; Parnell Decl. ¶¶ 11, 14–15. The Authors wrote *Tango* for children, and its publisher recommends it for young children (although the book is

appropriate for all ages). *See* Richardson Decl. ¶¶ 5, 9; Parnell Decl. ¶¶ 5, 9. *Tango* has clear pedagogical worth: It tells a true and heartwarming story, and teaches students about animal behavior, adoption, diversity among family structures, and responsible family values. *See* Richardson Decl. ¶¶ 11, 14–15; Parnell Decl. ¶¶ 11, 14–15. It has been showered with accolades from literary and educational groups because of its value to children. *See* Richardson Decl. ¶ 12; Parnell Decl. ¶ 12. The book is factually accurate and contains no vulgarity, obscenity, or explicit content that may not befit a school environment or be appropriate for children. Richardson Decl. ¶ 9–11; Parnell Decl. ¶ 9–11; *see also* Gay Decl., Ex. A. *Tango*'s poignant story and colorful illustrations are innocent and heartwarming. The book is in many public school libraries throughout the country, including those in Lake County, Florida. But *Tango*'s depiction of a same-sex partnership between Roy and Silo, despite being objectively true, has provoked challenges to the book's inclusion in Florida school libraries.[2]

## B.   The State Passes H.B. 1557, Rooted in Discriminatory Animus

In 2022, Florida enacted House Bill 1557 (commonly known as the "Don't Say Gay" Law),   a vague, overbroad, discriminatory statute prohibiting

---

[2] *See, e.g.*, Judd Legum, *Florida English teacher pushing book bans is openly racist and homophobic, students allege*, Popular Information (Jan. 9, 2023), https://popular.info/p/florida-english-teacher-pushing-book [https://perma.cc/2T9M-2X8Y] (reporting that *Tango*'s inclusion in Escambia County, Florida school libraries was challenged on the basis that the book promotes the "LGBTQ agenda").

"[c]lassroom instruction … on sexual orientation or gender identity … in kindergarten through grade 3" (the "Ban") (codified at Fla. Stat. § 1001.42(8)(c)(3)). Florida has since passed 2023 House Bill 1069 (together with H.B. 1557, the "Acts"), which expands the Ban to cover prekindergarten through eighth grade. H.B. 1069 was signed into law on May 17, 2023 and will become effective on July 1, 2023.

The Ban's discriminatory anti-LGBTQ+ intent became clear during the legislative process. Lawmakers rejected amendments that would have made the law viewpoint-neutral. By way of example, during deliberations on H.B. 1557, Senator Tina Polsky proposed an amendment to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality." That amendment was voted down.[3] An amendment proposed by Republican Senator Jeff Brandes would have replaced "sexual orientation or gender identity" with "human sexuality or sexual activity." It too was voted down, despite Senator Brandes imploring his colleagues that "[i]f the intent [of H.B. 1557] is not to marginalize anyone, let's make sure we aren't."[4]

The State thus proceeded with a Ban that uses the terms "sexual orientation" or "gender identity" without defining them (much less defining them to

---

[3] Fla. S., recording of proceedings, at 04:50:30–04:55:00 (Mar. 7, 2022), http://bit.ly/442voD3.

[4] Fla. S. Comm. on Appropriations, recording of proceedings, at 01:04:00–01:07:00 (Feb. 28, 2022), http://bit.ly/43ZHfBq.

include all sexual orientations).[5] H.B. 1069 did not clarify these terms when expanding the Ban to additional grade levels. Because of its imprecision, the Ban permits—and indeed, invites—invidious discrimination against a particular disfavored viewpoint: accepting and supporting LGBTQ+ individuals.

## C.   The Lake County Defendants Restrict *Tango* from Its Target Audience Based Solely on the Book's Viewpoint

Through their vagueness, the Acts allow school districts to discriminatorily enforce the Ban to target only the disfavored viewpoint of acceptance of LGBTQ+ individuals. And that is exactly what the Lake County Defendants have done. In or before December 2022, the Lake County Board decided to deprive kindergarten through third-grade students of access to the lauded and beloved *Tango*, which was previously accessible to Lake County students in all grades.[6] *See* Gay Decl., Ex. D, at 1.[7] The Board provided no justification for its decision beyond stating that the book was "[a]dministratively removed due to content regarding sexual orientation/gender identification prohibited in

---

[5] Other amendments intended to clarify the scope and effect of the Ban were similarly voted down. *See* Fla. S., *supra* note 3, at 05:23:30–05:33:30; *id.* at 05:33:30–05:37:00; Fla. H.R., recording of proceedings, at 03:47:30–03:54:00 (Feb. 22, 2022), http://bit.ly/3Jm97rw.

[6] Some Lake County public school libraries do not have a copy of *Tango*, but they can borrow the book from other Lake County schools via interlibrary loan.

[7] *See also* Joshua Q. Nelson, *Florida school district bans book about real-life gay penguin relationship, citing Parental Rights law*, Fox News (Jan. 9, 2023), https://www.foxnews.com/media/florida-school-district-bans-book-about-real-life-gay-penguin-relationship-citing-parental-rights-law [https://perma.cc/SNV5-8XLK].

HB 1557." Gay Decl., Ex. D, at 1. The Board provided the same justification for restricting 39 other books, all of which are now listed on Destiny—Lake County Schools' library catalog—as "AVAILABLE TO GRADES 4 AND UP ONLY PER HB 1557." Gay Decl., Ex. B.

Books with content extremely similar to *Tango*'s, but which feature opposite-sex parents, have been left unrestricted in Lake County school libraries.[8] In fact, all 40 books that have been restricted by the Board pursuant to H.B. 1557 have a single common characteristic: they all express support for LGBTQ+ individuals, whether through celebrating events related to the fight for LGBTQ+ rights, highlighting the history of Pride parades, or simply expanding the representation of LGBTQ+ people in literature by featuring LGBTQ+ protagonists.[9] The school library catalog reveals that these books have been officially categorized by the district as having LGBTQ+ topics such as "[h]omosexuality," "[g]ender identity," "[g]ay youth," "[g]ay parents," and/or "[t]ransgender people." *See, e.g.*, Gay Decl., Ex. C at 10, 14, 16, 24, 50, 56–57.

The Authors, who are themselves a same-sex couple, were troubled to learn that *Tango* had been made inaccessible to kindergarten through third-

---

[8] For example, *A New Barker in the House* is a children's book featuring a fictional family of dogs who adopt a puppy. Tomie dePaola, *A New Barker in the House* (2002). This book remains available and unrestricted in Lake County public school libraries as of June 12, 2023. *See* Gay Decl., Ex. E.

[9] *See* Gay Decl., Ex. B.; Gay Decl., Ex. C; Jo Rippon, *Rise Up!: The Art of Protest* (2020); Kari Lavelle, *We Move the World* (2021); Matt de la Peña, *Milo Imagines The World* (2021).

grade students. The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own. Richardson Decl. ¶ 15; Parnell Decl. ¶ 15. *Tango*'s restriction in Lake County schools is based in anti-LGBTQ+ animus and violates the Authors' First Amendment rights because it censors *Tango*'s viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

E.S., D.S., and M.H. live in Lake County. Roe Decl. ¶ 4. E.S. will attend a Lake County public school beginning in the fall, and D.S. and M.H. will continue to do so. Roe Decl. ¶ 5. They are entering kindergarten, first grade, and third grade, respectively. *Id.* Each child would check out *Tango* from his school library and read it when the fall semester begins. Roe Decl. ¶¶ 10, 12, 14. But the enactment of H.B. 1557 and the Lake County Board's resulting decision to restrict access to *Tango* has prevented D.S. and M.H. from checking out the book and will prevent each of the Student Movants from obtaining *Tango* through their school libraries this fall. *Id.*; *see also* Gay Decl., Ex. B at 1.

## LEGAL STANDARD

A party is entitled to a preliminary injunction if it shows that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant

outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

## ARGUMENT

### I.   Movants Are Likely to Succeed on the Merits

#### A.   The Author Movants Are Likely to Succeed on the Merits of Their Viewpoint Discrimination Claim

*Tango* is speech by the Author Movants. Under the First Amendment, the government "shall make no law … abridging the freedom of speech." U.S. Const. amend. I; *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936) (First Amendment incorporated against states). The Lake County Defendants' restriction of access to *Tango* is unconstitutional viewpoint discrimination— "an egregious form of content discrimination" that is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). At the very least, it is content discrimination that fails strict scrutiny.

Despite previously allowing the purchase of *Tango*, providing the book in public school libraries, and allowing all students to check it out, the Lake County Defendants have restricted access to *Tango* because of the topic discussed, idea or message expressed, and opinion of the Author Movants— namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can

9

adopt and raise healthy children. Richardson Decl. ¶ 14; Parnell Decl. ¶ 14. The Lake County Defendants did so because of animus toward the book's viewpoint, as well as possible state enforcement actions under the Ban, which punishes speech based on the topic discussed, idea or message expressed, and opinion of the speaker. The Lake County Defendants' "rationale[s] for the restriction" are each specifically tied to the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

It is a cardinal principle of First Amendment law that, even in a nonpublic forum, "[t]he government's ability to limit speech … is not unlimited." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1202 (11th Cir. 2009). The state cannot "suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998)). Viewpoint discrimination is "impermissible" even in a nonpublic forum, *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1226 (11th Cir. 2017), and is "presumed to be unconstitutional," *Rosenberger*, 515 U.S. at 828; *see also Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (recognizing that "there is an argument that such [viewpoint-discriminatory] regulations are unconstitutional *per se*; the Supreme Court has said that 'the First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others,'" but not

10

deciding the issue because action failed strict scrutiny (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984))).

Lake County Schools explained that *Tango* was restricted "due to *content* regarding sexual orientation/gender identification prohibited in HB 1557" (emphasis added).[10] But the Board did not restrict access to all books with content extremely similar to *Tango*'s. Books regarding animal behavior and adoption involving opposite-sex parents have been left unrestricted in Lake County school libraries. *See* Gay Decl., Ex. E; Tomie dePaola, *A New Barker in the House* (2002). "Of course, the government rarely flatly admits it is engaging in viewpoint discrimination. In lieu of such evidence, plaintiffs may demonstrate viewpoint discrimination based on a pattern of enforcement that evinces a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." *Zukerman v. U.S. Postal Serv.*, 567 F. Supp. 3d 161, 174 (D.D.C. 2021) (cleaned up) (quoting *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018); *Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316, 331 (D.D.C. 2021)).

---

[10] Judd Legum, *"Don't Say Gay": Florida schools purge library books with LGBTQ characters*, Popular Information (Jan. 5, 2023), https://popular.info/p/dont-say-gay-florida-schools-purge [https://perma.cc/B7LZ-F6M6].

In addition to *Tango*, all 39 other books that have been restricted by the Board pursuant to H.B. 1557 express support for LGBTQ+ individuals.[11] Thirty-seven of these restricted books, including *Tango*, have been labeled by Lake County's school library catalog, Destiny, as including content related to "[h]omosexuality," "[g]ay youth," "[g]ay parents," "[t]ransgender people," and other terms associated with LGBTQ+ individuals. Gay Decl., Ex. C. Three restricted books have not been given LGTBQ+-related labels by the library system but contain material relating to LGBTQ+ issues and themes.[12] Each restricted book, like *Tango*, expresses a message of inclusion and tolerance, or simply acknowledges the existence of LGBTQ+ individuals.[13] In restricting access to these books and no others, the Board has revealed that it disfavors this viewpoint, as the Acts intended.

Because the Acts and their application to *Tango* are viewpoint-discriminatory, they are *per se* unlawful. *Otto*, 981 F.3d at 870 n.12. *Tango* is factually accurate, non-vulgar, and non-obscene, and thus the only basis for the restriction of access to this previously unrestricted book is the Act and the Lake

---

[11] *See* Gay Decl., Ex. C; Rippon, *supra* note 9; Lavelle, *supra* note 9; Peña, *supra* note 9.

[12] *See* Rippon, *supra* note 9; Lavelle, *supra* note 9; Peña, *supra* note 9.

[13] *See* Gay Decl., Ex. C; Rippon, *supra* note 9; Lavelle, *supra* note 9; Peña, *supra* note 9.

County Defendants' discrimination against the book's viewpoint. This likely renders the restriction of the book *per se* unlawful.

At a minimum, the restrictions "depend on what is said, [and thus] are content-based restrictions that must receive strict scrutiny," which they fail. *Otto*, 981 F.3d at 861. Strict scrutiny requires the government to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (cleaned up). Even if the Lake County Defendants invoke their "legitimate authority to protect children," that authority "does not include a free-floating power to restrict the ideas to which children may be exposed." *Otto*, 981 F.3d at 868 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011)). "So while protecting children is a crucial government interest, speech 'cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Id.* (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975)). The Lake County Defendants' actions in restricting books based on LGBTQ+ animus are flatly unconstitutional.

Specifically, in response to public records requests, the Lake County Defendants have not offered any explanation as to how restricting students' access to *Tango* protects children. *See* Gay Decl., Ex. D. Nor can they: *Tango* is factually accurate, non-vulgar, and non-obscene. Richardson Decl. ¶ 9–11; Parnell Decl. ¶ 9–11; *see also* Gay Decl., Ex. A. Defendants' "majority preference"

13

to restrict access to otherwise age-appropriate content solely because it relates to LGBTQ+ issues and themes cannot justify the restriction. *Otto*, 981 F. 3d at 869. "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

The restriction of access to *Tango* is impermissible content- and viewpoint-discrimination that is *per se* unlawful and fails strict scrutiny. The Author Movants are thus highly likely to succeed on the merits of their claims.

### B.   The Student Movants Are Likely to Show That the Restriction of *Tango* Violates Their Right to Receive Information

In addition to violating the Author Movants' right to speak, the restriction of *Tango* infringes upon the Student Movants' corollary "right to receive information and ideas." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866–67 (1982) (plurality opinion) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). "[S]tudents may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.… [S]chool officials cannot suppress 'expressions of feeling with which they do not wish to contend.'" *Pico*, 457 U.S. at 868 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969)).

And "the special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights

14

of students." *Id.* Unlike a classroom, the materials in a school library are available for students' voluntary reading and not part of a prescribed curriculum. *See Pico*, 457 U.S. at 869; Roe Decl. ¶ 6. "[I]n light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics, [a] School Board's non-curricular decision to remove a book well after it ha[s] been placed in the public school libraries evokes the question whether that action might not be an unconstitutional attempt to 'strangle the free mind at its source.'" *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 190 (5th Cir. 1995) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)).

School boards' discretion "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment" and "may not be exercised in a narrowly partisan or political manner" or used for the "suppression of ideas." *Pico*, 457 U.S. at 864, 870–71. School officials may restrict speech that would "undermine [a] school's basic educational mission," such as "vulgar and lewd speech," but they may not impose such restrictions based on "political viewpoint." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986).

Eleventh Circuit law is unsettled as to which of two standards governs "right to receive information" claims in school library book removal cases. The Eleventh Circuit has declined to decide whether the operative test is the standard applied to the removal of a school library book by the Supreme Court in

15

*Pico*, 457 U.S. 853, or the standard for curricular speech outlined in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202. *Tango*'s removal is unconstitutional under either test. *Tango* has been made inaccessible because of the LGBTQ+-affirming viewpoint it expresses rather than for any legitimate pedagogical reason. Though Plaintiffs believe that *Pico* is the appropriate standard to apply in this case,[14] under either *Pico* or *Hazelwood*, the restrictions placed by the Lake County Board on students' ability to access *Tango* due to its LGBTQ+-positive viewpoint are unconstitutional.

Restricting access to *Tango* violates the Student Movants' right to receive information under *Pico*. A school board violates students' First Amendment right to receive information when it restricts students' access to materials in order to deny the students "access to ideas with which [the School Board] disagree[s]." *Pico*, 457 U.S. at 871. School boards cannot restrict access to books simply because they dislike the ideas contained in them and seek, by the restriction, to "prescribe what shall be orthodox in politics, nationalism, religion,

---

[14] *Hazelwood* focused on "expressive activities … [that] may fairly be characterized as part of the school curriculum," 484 U.S. at 271, but in the school library, students "can … discover areas of interest and thought not covered by the prescribed curriculum," *Pico*, 457 U.S. at 869 (quoting *Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978)). Federal courts in the Eleventh Circuit have cited to *Pico* in discussing students' right to access materials in schools and have found "persuasive its characterization of the First Amendment right to receive information and ideas." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 2022 WL 16985720, at *12 (N.D. Fla. Nov. 17, 2022); *see also, e.g.*, *Virgil v. Sch. Bd.*, 862 F.2d 1517 (11th Cir. 1989).

16

or other matters of opinion." *See Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202 (quoting *Pico*, 457 U.S. at 872).

The Lake County Board has not publicly elaborated on the rationale behind its decision to prohibit kindergarten through third-grade students from checking out *Tango* in their school libraries beyond claiming that this result was required under H.B. 1557. *See* Gay Decl., Ex. D, at 1. But the Board's decision to restrict under H.B. 1557, in 40 instances, exclusively books expressing a pro-LGBTQ+ viewpoint reveals its motivation to use the intentionally vague and overbroad statute to restrict access to books containing ideas with which the Board disagrees. *Cf. Pico*, 457 U.S. at 870–71 ("If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books. The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration.").[15] Either the statute is viewpoint-discriminatory, the Board was viewpoint-discriminatory, or both. No matter which of these is

---

[15] Justice Rehnquist "cheerfully concede[d]" this point in his dissent, along with the proposition that school boards may not exercise their discretion over the content of school libraries in a "narrowly partisan or political manner." *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting).

the case, this viewpoint-based restriction violates "[o]ur Constitution[,] [which] does not permit the official suppression of *ideas*." *Pico*, 457 U.S. at 871.

Restricting access to *Tango* is unconstitutional under *Hazelwood* too. The *Hazelwood* test—which emerged in the context of classroom curriculum, not libraries—would arguably allow school boards curatorial control over the books in school libraries, but boards' curatorial decisions would still have to be "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273; *see also Virgil*, 862 F.2d at 1523 (applying *Hazelwood* test in context of school board's curricular decision to discontinue use of textbook it deemed sexually explicit and vulgar). This requires school boards "to provide legitimate reasons for limiting students' access to information." *Arce v. Douglas*, 793 F.3d 968, 982 (9th Cir. 2015) (citing *Virgil*, 862 F.2d at 1522).

The suppression of disfavored viewpoints is never a legitimate pedagogical reason for restricting materials in public school libraries. *Hazelwood* does not "offer[] any justification for allowing educators to discriminate based on viewpoint" *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989). Under *Hazelwood*, the First Amendment "require[s] school officials to make decisions relating to speech which are viewpoint neutral." *Id.* (citing *Virgil*, 862 F.2d at 1522–23 n.6). In fact, citing *Searcey*, the Second Circuit has held that "a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate

18

pedagogical interests." *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 633 (2d Cir. 2005).

There is no legitimate pedagogical basis for prohibiting access to *Tango*. Legitimate pedagogical reasons for removing student access to a book include that the book is factually inaccurate; contains obscenities, offensive language, vulgarity, or sexually explicit content; or is "psychologically or intellectually inappropriate for the age group." *Virgil*, 862 F.2d at 1521–22 (quoting *Pico*, 457 U.S. at 880 (Blackmun, J., concurring in part and concurring in the judgment)); *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202. None of these justifications applies to *Tango*. Richardson Decl. ¶¶ 10–11. *Tango* is not a "purportedly nonfiction book" that "indisputably … contain[s] inaccuracies." *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1182, 1211. To the contrary, it is a fictional book[16] that is nonetheless based on real events and depicts them in a verifiably accurate manner. Parnell Decl. ¶¶ 5–7, 11.

Nor does *Tango* contain any "explicit sexuality [or] excessively vulgar language" that might justify the Board in keeping it out of the hands of younger students. *Virgil*, 862 F.2d at 1523; Parnell Decl. ¶ 10. The book is entirely appropriate for all age groups, including students in kindergarten through third grade. The book's publisher recommends *Tango* for young children, the same

---

[16] *See* Gay Decl., Ex. C, at 9 (Lake County's school library catalog using "Fiction" labels for *Tango*).

audience that the Board now prevents from accessing the book. Richardson Decl. ¶ 9. The Board does not have a legitimate pedagogical basis for restricting *Tango* and thus its decision to do so based on the book's viewpoint is unconstitutional under *Hazelwood*.

Under either the *Pico* or the *Hazelwood* test, the Lake County Board's non-pedagogical, viewpoint-discriminatory motive for restricting access to *Tango* is plainly unconstitutional. The Student Plaintiffs are thus highly likely to succeed on the merits of their claim.

## II.   Movants Face Continuing Irreparable Harm from the Ongoing and Impending Injury to Their First Amendment Rights

The injury to Movants, who are impeded from expressing themselves and receiving ideas, is irreparable *per se*. "[A]n ongoing violation of the First Amendment constitutes an irreparable injury." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) (quoting *FF Cosmetics*, 866 F.3d at 1298). Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also FF Cosmetics*, 866 F.3d at 1298 (same); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (same).

The ongoing and impending violation of Movants' First Amendment rights necessarily entails continuing irreparable injury. *See Otto*, 981 F.3d at 870 (because plaintiffs in a free speech case were likely to succeed on the merits, "[t]hey also [met] the remaining requirements as a necessary legal consequence"). The Lake County Defendants deployed H.B. 1557 to censor *Tango* on the basis of its viewpoint and content. Because the Lake County Defendants stripped *Tango* of an essential part of its communicative value and limited the extent to which the Author Movants can speak through their book, the Author Movants have been injured in their exercise of their free speech rights since at least December 2022, when access to *Tango* was restricted.

D.S., E.S., and M.H. want to read *Tango* and have specific plans to do so, but those plans have been foiled by the Lake County Defendants' restrictions. Roe Decl. ¶¶ 10, 12, 14. D.S. and M.H.'s ability to receive information—namely, *Tango*'s wholesome story and message of tolerance—has been limited since last December because of the Lake County Defendants' suppression of *Tango*. *Id.* When E.S. begins school this fall, he too will be unable to check out *Tango* due to that suppression.

Four of five Movants have lost their First Amendment freedoms for at least seven months and running—far more than the "minimal period[] of time" the Supreme Court described as sufficient for irreparable harm in *Roman Catholic Diocese*. 141 S. Ct. at 67. And because this harm continues and shows

21

no sign of abating, Plaintiffs are suffering a *per se* irreparable injury that entitles them to preliminary injunctive relief. *See Speech First*, 32 F.4th at 1128.

## III. An Injunction Ending an Unconstitutional Deprivation of Rights Would Be Equitable and in the Public Interest

A preliminary injunction requiring the restoration of unrestricted access to *Tango* satisfies the final two prongs of the applicable test: Enjoining the Lake County Defendants' unconstitutional suppression of *Tango* is unquestionably in the public interest, and the Lake County Defendants would suffer no damage from such an injunction. "When the nonmovant is the government, the third and fourth requirements [for a preliminary injunction]—'damage to the opposing party' and 'the public interest'—can be consolidated." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 955 (11th Cir. 2022) (citing *Otto*, 981 F.3d at 870). Indeed, "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [policy]." *Id.*

Vindicating Movants' First Amendment rights is in the public interest. The public has no legitimate interest in restricting protected, pedagogically valuable speech on the basis of viewpoint. *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009); *LaCroix*, 38 F.4th 941 at 955; *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public … has no interest in enforcing an unconstitutional law."). Conversely, "it is *always* in the public interest to protect First Amendment liberties." *Joelner v.*

*Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (emphasis added) (internal quotation marks omitted); *see Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("[T]he public interest is served when constitutional rights are protected."); *Speech First*, 32 F.4th at 1128 ("[T]he First Amendment, in particular, serves significant societal interests." (quoting *First Nat'l Bank of Bos. v. Belotti*, 435 U.S. 765, 776 (1978))). "[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury," *KH Outdoor*, 458 F.3d at 1272, and the Lake County Defendants will not be damaged by a preliminary injunction because they have "no legitimate interest" in continuing their unconstitutional behavior, *id.*

The result would be the same even if Movants' claims had no constitutional dimension, because of *Tango*'s value to students and to the educational mission of public schools. *Tango* offers a factually accurate, wholesome story that teaches students about animal behavior and varied family structures, as well as values of tolerance and acceptance. Parnell Decl. ¶¶ 11, 14. The public interest is unquestionably served when schoolchildren in Lake County are exposed to different points of view through a factually accurate, age-appropriate book such as *Tango*. If *Tango* were returned to the shelves of Lake County school libraries, many children would benefit, and no person (least of all the Lake County Defendants) would suffer any harm. The balance of equities and the public interest strongly favor granting Movants the relief they seek.

23

The injury to Movants substantially outweighs any damage (there is none) that an injunction would cause to the Lake County Defendants. *Tango* was a library book, not a part of any school curriculum. *See* Roe Decl. ¶ 6; Gay Decl., Ex. C, at 9. The Lake County Defendants would suffer no injury if a child in third grade or below encountered *Tango* in a school library: The child would benefit from the book's educational content, and the Lake County Defendants would not incur any pecuniary or other harm. But Movants have suffered a real harm because the Authors' speech cannot reach their intended audience, despite its pedagogical value to that audience, and because the Student Movants cannot read *Tango* in their public school libraries. Because Movants have suffered and will continue to suffer a real harm absent an injunction and the Lake County Defendants would suffer no harm from being enjoined, the balance of equities and the public interest favor the Movants.

No security is required for the requested injunction because the Lake County Defendants would suffer no costs if wrongfully enjoined, and Movants have been deprived of a fundamental right. *See Complete Angler*, 607 F. Supp. 2d at 1335.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) and Local Rule 6.02, requiring the Lake County Defendants to restore students' ability to access *Tango* regardless of

24

grade level in Lake County public school libraries before the first day of school on August 10, 2023, and throughout the pendency of this action.

Dated:  New York, NY
        June 21, 2023

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By:  /s/        *Faith E. Gay*
     Faith E. Gay (FBN 129593)
     Lauren J. Zimmerman*
     Max H. Siegel*
     Nancy A. Fairbank*
     Rachel Slepoi*
     SELENDY GAY ELSBERG PLLC
     1290 Avenue of the Americas
     New York, NY  10104
     Tel: 212-390-9000
     fgay@selendygay.com
     lzimmerman@selendygay.com
     msiegel@selendygay.com
     nfairbank@selendygay.com
     rslepoi@selendygay.com

     Anna T. Neill (FBN 100945)
     William J. Blechman (FBN 379281)
     KENNY NACHWALTER, P.A.
     1441 Brickell Avenue, Suite 1100
     Miami, FL 33131
     Tel: 305-373-1000
     atn@knpa.com
     wjb@knpa.com

     *Counsel for Plaintiffs*

     *(application for admission *pro hac vice*
     forthcoming)

25