# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

|  |  |
|---|---|
| PETER PARNELL ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> SCHOOL BOARD OF LAKE COUNTY, FLORIDA ET AL., <br><br> *Defendants*. | Case No. 5:23-cv-00381 |

## STATE DEFENDANTS' MOTION TO DISMISS

Florida's HB 1557, 2022 Fla. Laws ch. 22, as modified by HB 1069, 2023 Fla. Laws ch. 105, restricts "classroom instruction . . . on sexual orientation or gender identity" in Florida's public schools, Fla. Stat. § 1001.42(8)(c)3. Consistent with that language, the Florida Department of Education and State Board of Education (collectively, "the State" or "the State Defendants") have maintained that "[t]he statute does not even arguably restrict library books." *Cousins v. Grady*, No. 6:22-cv-1312 (M.D. Fla.), DE120 at 4 (Dec. 21, 2022); *see Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134 (N.D. Fla.), DE134 at 27 (Nov. 30, 2022) ("[L]ibrary books, without more, are not 'classroom instruction' and thus are not covered by the statute."). Nevertheless, in December 2022, the Lake County School Board ("Lake County" or "the County") restricted access to a book called *And Tango Makes Three* in its school libraries and pointed to HB 1557 as the reason for its decision. DE1 ¶ 9.

Six months later, Plaintiffs filed this lawsuit "to restore *Tango* to public school libraries and to make the book accessible to students of all ages in Lake County public schools." DE1 ¶ 16. As this Court intimated in denying Plaintiffs' motion for a preliminary injunction, DE51, the case is now moot because the County has abandoned its erroneous interpretation of the statute and formally lifted the restriction on *Tango*, *see Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1283 (11th Cir. 2004) ("[T]he Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit.").

Mootness aside, Plaintiffs lack standing to sue the State Defendants. HB 1557 does not regulate library books, so Plaintiffs cannot trace their injuries to the State Defendants' enforcement of HB 1557. Nor would an order enjoining the State Defendants "be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

Plaintiffs' claims fare no better on the merits. The curation of school library books is government speech, and when the government speaks, it may "regulate the content of . . . its own message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Nor is HB 1557 impermissibly vague. The statute regulates only the job duties of government employees, and courts have blessed far more open-textured restrictions in that context. *E.g.*, *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 664–66 (6th Cir. 1987) (approving restriction on "conduct unbecoming a teacher").

For these reasons, the complaint should be dismissed.

2

# BACKGROUND

## A.    HB 1557 and HB 1069

**1.** The enactment of HB 1557 was precipitated by lawsuits against district school boards for "withholding information from the parent[s] regarding their student's gender transition."[1] Clay County School Board, for example, was "sued by parents" alleging that "school officials hid their 12-year-old daughter's mental health and gender identity issues for months—only informing them after the child [twice] attempted suicide in the school bathroom."[2] Those incidents were symptomatic of a broader issue: "multiple school districts in Florida maintain[ed] policies that exclude[d] parents from discussions and decisions on sensitive topics relating to students.[3] Miami-Dade County was instructing teachers that "[w]hen contacting the parent/guardian of a transgender or gender expansive student, school staff should use the student's legal name and the pronoun corresponding to the student's assigned sex at birth, unless the student or parent/guardian has specified otherwise."[4] Broward County went even further, telling teachers that (1) they would violate federal law if they divulged students'

---

[1] Fla. H.R. Staff, Final Bill Analysis, CS/CS/HB 1557—Parental Rights in Education at 5 & n.26 (Mar. 28, 2022), https://tinyurl.com/29ddsm5f (citing Ana Goñi-Lessan, *Lawsuit against Leon Schools says district excluded parents from gender discussions*, Tallahassee Democrat (Nov. 16, 2021), https://tinyurl.com/mpwennaa).

[2] *Another Florida School Board Sued over Concealing Gender Identity Counseling from Parents*, Tallahassee Reports (Jan. 30, 2022), https://tinyurl.com/nhh7f85p.

[3] Final Bill Analysis, *supra* n.1, at 4–5 & nn.25–26 (identifying Leon, Broward, Palm Beach, Miami-Dade, Sarasota, Volusia, and Hillsborough County policies).

[4] Miami-Dade County Public Schools, *2020-2021 Guidelines for Promoting Safe and Inclusive Schools* at 7 (July 2020), https://tinyurl.com/yubez4mn.

LGBTQ+ status to their parents, (2) they should refuse to answer parents' questions about such issues, and (3) they "cannot encourage . . . a student to be 'out' at home."[5] Many counties had similar policies.[6]

Meanwhile, some Florida school boards also published "Guidelines for Curriculum" that both encouraged teachers to "include affirmative topics about LGBTQ+ persons in curriculum and classroom discussions" and admonished that "[n]o parental notification is needed for these classroom discussions."[7] These school boards began using child-focused ideas to teach adult topics, invoking the youthful image of a gingerbread man[8] or the fictional story of a transgender peer to teach gender identity.[9]

---

[5] Broward County Public Schools, *Lesbian, Gay, Bisexual, Transgender, Questioning + Critical Support Guide* at 26 (2012), https://tinyurl.com/2p8u5snh.

[6] Duval County Public Schools, *Lesbian, Gay, Bisexual, Transgender, Questioning (LGBTQ+) Support Guide* at 12 (2020), https://tinyurl.com/4kuu5xvf; Hillsborough County Public Schools, *Lesbian, Gay, Bi-Sexual, Transgender, and Questioning/Queer (LBGTQ+) Critical Resource and Support Guide for Staff* at 16 (2021), https://tinyurl.com/w6a8yvrw; Pinellas County Schools, *Inclusive Schools Support Guide: Promoting Safe and Inclusive Schools* at 22–23 (2020), https://tinyurl.com/mr4a2fx4; Volusia County Schools, *Lesbian, Gay, Bi-sexual, Transgender and Questioning (LGBTQ) Support Guide* at 11 (2020), https://tinyurl.com/2ekuu72j.

[7] Palm Beach County School District, *The School District of Palm Beach County LGBTQ+ Critical Support Guide* at 80 (2021) (embedded in Kate Payne, *Palm Beach school district pulls LGBTQ support guide from its website*, WLRN 91.3 FM (July 15, 2022), https://tinyurl.com/3tzk7ec5).

[8] Sam Killerman, *The Genderbread Person version 3*, https://tinyurl.com/ynfysscf (last visited Aug. 4, 2023); *Parent References 'GenderBread Person' in Public Testimony on Parental Rights in Education Bill*, Tallahassee Reports (Mar. 3, 2022), https://tinyurl.com/bd5aadyd.

[9] *See* Lois K. Solomon, *Florida School District Pulls 2 Books about Transgender Kids, Including 'I Am Jazz'*, S. Fla. Sun-Sentinel (Apr. 6, 2022), https://tinyurl.com/ymd2scmr.

Broward County, among many other examples, told teachers to respond to kindergar-teners' questions on these topics by explaining that "Gay (for grades Pre-K-2)" means "[a] person who has romantic feelings for someone of the same gender." Broward County Public Schools, *LGBTQ+ Critical Support Guide*, *supra* n.5, at 10. "Transgender (Grades K-4)" means that "[w]hen a baby is born, they are given a gender. Transgender people change their gender once they are old enough to explain to others how they feel about their own gender. This person may change their name or pro-noun." *Id.* at 12. Broward also directed that "[n]o parental notification is needed for these classroom discussions." *Id.* at 54.

**2.** The Florida Legislature responded by enacting HB 1557. 2022 Fla. Laws ch. 22 (Mar. 8, 2022) (HB 1557). Entitled "[a]n act relating to parental rights in educa-tion," the legislation "reinforce[s] the fundamental right of parents to make decisions regarding the upbringing and control of their children." *Id.* pmbl. HB 1557 does so in two key ways.

*First*, the bill requires transparency with parents regarding the health and well-being of their children. For instance, school districts and their personnel must encour-age students to discuss their well-being with their parents. Fla. Stat. § 1001.42(8)(c)1.–2. School boards must also "notify parents [annually] of each healthcare service offered at their student's school and the option to withhold consent or decline any specific service." *Id.* § 1001.42(8)(c)5. They must "adopt procedures for notifying a student's parent if there is a change in the student's services or monitoring related to the stu-dent's mental, emotional, or physical health or well-being." *Id.* § 1001.42(8)(c)1. And

school districts also may not discourage discussion of their student's health with parents, particularly "critical decisions affecting a student's mental, emotional, or physical health or well-being," *id.* § 1001.42(8)(c)2., such as gender transition.

*Second*, the bill regulates public-school curricula by providing that "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." *Id.* § 1001.42(8)(c)3. In 2023, HB 1069 expanded the classroom-instruction limitation to cover "prekindergarten through grade 8." 2023 Fla. Laws ch. 105, § 3 (May 17, 2023) (HB 1069). Parents aware of a violation may either (1) ask the Commissioner of Education to appoint a special magistrate to review the matter and issue a recommendation, which the State Board of Education may accept or reject, or (2) sue the school board in state court. Fla. Stat. § 1001.42(8)(c)7.b.

**B.** **_And Tango Makes Three_ and Lake County**

*And Tango Makes Three* is a book about two male penguins that ostensibly raised a baby penguin together in the Central Park Zoo. DE1 ¶¶ 82–86. Lake County provides copies of *Tango* through its school library system. *Id.* ¶ 6. Incorrectly believing that HB 1557's restriction on "classroom instruction" applied to school library books, the County restricted library access to *Tango* for children in kindergarten through third grade. *Id.* ¶¶ 94–95. In response, the authors of *Tango* and several Lake County students sued the County and the State, seeking an injunction against Lake County "to restore unrestricted student access to *Tango*" and against the State Defendants to

"prohibit[]" them "from enforcing" HB 1557 or HB 1069 (collectively, "HB 1557"). *Id.* ¶ 127.

After Plaintiffs sued, the County became aware that the State had consistently taken the position that HB 1557's restriction on "classroom instruction" does not apply to the selection of library materials. *See* DE39 at 7. Lake County's Superintendent immediately ordered that the age-restriction tag be removed from *Tango*, *id.* at 7–8, and that the book be offered to all students in the Lake County school system, *id.* at 11–12. A few weeks later, Lake County's School Board abandoned its erroneous interpretation and formally adopted "the prevailing legal interpretation" that HB 1557 does "not apply[] to school libraries." DE47-3; *see also* DE47-1.

## LEGAL STANDARD

To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (quotations omitted). The Court must "assume the veracity of well-pleaded factual allegations" but must not credit mere "labels and conclusions." *Id.* (quotations omitted). But in evaluating mootness, the Court must "look at the events at the present time, not at the time the complaint was filed." *Djadju v. Vega*, 32 F.4th 1102, 1106 (11th Cir. 2022).

## ARGUMENT

The Court lacks jurisdiction both because this case is moot and because Plaintiffs never had standing in the first place. The complaint also fails to state a claim.

I.    THE COURT LACKS JURISDICTION.

A.    This case is moot.

Plaintiffs sued "to restore *Tango* to public school libraries and to make the book accessible to students of all ages in Lake County public schools." DE1 ¶ 16. But as this Court explained in denying Plaintiffs' motion for a preliminary injunction as moot, DE51 at 15–23, Lake County has since "removed" the "age restriction tag" on *Tango*, which is now available for students of all ages to read, DE39-1 ¶¶ 15, 17. "[B]ecause the Court cannot compel Defendants to do something they have already done and have promised to do in the future, . . . there is no live controversy to consider." DE51 at 22–23. The Court should therefore dismiss this case as moot. *See Djadju*, 32 F.4th at 1106 (a case is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief" (quotations omitted)).

Plaintiffs ask the Court to enjoin Defendants anyway because, they contend, Lake County's "voluntary cessation" leaves the County "free to return to [its] old ways." DE43 at 4 (quotation omitted). As a threshold matter, this Court correctly rejected Plaintiffs' assertion that "the Government bears a 'heavy' burden" on this issue. *Id.* (cleaned up); *see* DE51 at 17. Government defendants enjoy a "presumption that they are unlikely to resume illegal activities," *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1256 (11th Cir. 2017) (en banc) (quotation omitted), *abrogated on other grounds by Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021), because they "are more likely than private defendants to honor a professed commitment to changed ways," *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1267–68 (11th Cir.

8

2020) (quotations omitted). "That is especially true when, as here, a government defendant has formally rescinded a challenged . . . policy." *Id.*[10]

Consistent with that presumption, a government defendant "carrie[s] its burden" on mootness when the challenged policy "has ended" and there is no "evidence that the [defendant] has any plans to promulgate an identical" policy. *Health Freedom Def. Fund v. President of U.S.*, 71 F.4th 888, 892 (11th Cir. 2023). "[O]nce the repeal of [a policy] has caused [the Court's] jurisdiction to be questioned, the *plaintiff* bears the burden of presenting affirmative evidence that its challenge is no longer moot." *Flanigan's*, 868 F.3d at 1256 (emphasis added). To that end, the Eleventh Circuit has recognized three relevant considerations: (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate [the Court's] jurisdiction," (2) "whether the government's decision to terminate the challenged conduct was unambiguous" and "permanent," and (3) "whether the government has consistently maintained its commitment to the new policy." *Keohane*, 952 F.3d at 1268 (citations omitted). Ultimately, "the key inquiry" is whether there is a "substantial likelihood" that the defendant "will reverse course and reenact" the repealed policy, and "the plaintiff bears the burden" to show that there is. *Id.*

---

[10] Plaintiffs point to *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (DE43 at 4), which in no way modifies the well-established framework discussed above. In *West Virginia*, the government did not rescind the contested policy at all, and thus failed to carry its initial burden on the question of mootness. The opposite is true here.

Plaintiffs cannot carry that heavy burden because, among other reasons, there is no evidence whatsoever that Lake County lifted the age restriction on *Tango* to manipulate the Court's jurisdiction. The County restricted *Tango* in the first place because it mistakenly believed the restriction was required by HB 1557. DE39-1 ¶¶ 10–18. Once Lake County became aware of its erroneous interpretation and the State's longstanding view that HB 1557, by its plain and obvious terms, does not apply to library books and thus does not restrict the County's discretion in such matters, the County acted through its Superintendent—the same official that restricted *Tango* in the first place—to lift the restriction. DE39-1 ¶¶ 16–18. The Lake County School Board then ratified that decision, DE47-1, 47-3, not to eliminate this Court's jurisdiction (as Plaintiffs claim, DE48 at 4), but to eliminate any doubt about the permanence of the County's changed policy.

In short, "[j]ust like the government defendant[s]" in *Keohane* and *Flanigan's*, Lake County "has not merely declined to enforce the [age restriction] against [these Plaintiffs] in particular—so as, in effect, to give [them] a personalized exemption"— but effected "an unambiguous termination" of the challenged policy in that it "removed" the age restriction "in its entirety." *Keohane*, 952 F.3d at 1269 (quoting *Flanigan's*, 868 F.3d at 1261). Lake County has, moreover, assured this Court in a sworn affidavit that it will "continue" to "follow the law" and has instructed its personnel to do the same. DE39-1 ¶ 18; *see also* DE47-1. Plaintiffs' objections notwithstanding, the Eleventh Circuit credits the assurances of government defendants in its voluntary-cessation analysis. *See Flanigan's*, 868 F.3d at 1261–62; *Keohane*, 952 F.3d at 1269.

Plaintiffs' contrary arguments are unpersuasive. To the extent they believe the County's decision reflects impermanence because the State remains free to revisit its position regarding HB 1557 (DE43 at 5–6), there is not a shred of evidence that the State will do that. To the contrary, the State has consistently maintained before two federal courts (three, including this one) that HB 1557's plain language restricts only "classroom instruction" and "does not even arguably restrict library books." *Cousins*, DE120 at 1–4; *see Equal. Fla.*, DE134 at 27 ("[L]ibrary books, without more, are not 'classroom instruction' and thus are not covered by the statute.").

Plaintiffs are wrong that the State has shifted its view once before, pointing to a "DOE training" presentation that Lake County viewed as support for its initial decision to restrict access to *Tango*. DE43 at 5–6. The plaintiffs in *Equality Florida*, too, cited that document as evidence of inconsistency in the State's position. In response, the State explained in January 2023 that the document is clear from its title page that the training covers both "Library Media" and "Instructional Materials." *Equal. Fla*, DE157 at 2 (discussing *Equal. Fla.*, DE155, Ex. A at 1). The training first covers the criteria for "Library Materials." *Equal. Fla.*, DE155, Ex. A at 23–24. The training then covers the criteria for "Instructional Materials," understandably beginning with the "Common Selection Criteria" that apply both to "Instructional Materials" and the previously covered "Library Materials," such as a ban on pornography. *Id.* at 30–31. Consistent with the statutory text, which refers only to "classroom instruction," Fla. Stat. § 1001.42(8)(c)(3), the presentation teaches that HB 1557 is a criterion for the

selection of "instructional materials" in "addition" to the criteria that apply both to library materials *and* instructional materials.

Lake County mistakenly thought the presentation's reminder that library materials must be appropriate for the "[a]ge and grade level of students" instructed school boards to restrict library materials under HB 1557. DE39-1 ¶¶ 13–14, Ex. A at 15; DE47-3. But the Legislature's decision that certain materials are inappropriate for use in classroom instruction does not mean they are categorically inappropriate in the very different setting of a school library. The presentation does not suggest otherwise, and the State's position has always been consistent on this issue. If anything, Lake County's prior effort to "align" itself with what it *believed* to be the State's view, however mistaken, only confirms that Lake County's representation to this Court that it has rescinded the age restriction on *Tango* to "align" with the State's position (DE39-1 ¶¶ 14–15) is a legitimate, good-faith assurance that the Court should credit. *See Flanigan's*, 868 F.3d at 1261–62; *Keohane*, 952 F.3d at 1269.

Were there any residual doubt about the permanence of the County's decision, it was dispelled when the County's School Board voted to prohibit "all district employees from following further informal guidance" from the State on this issue, meaning that the policy will change only as a result of formal Department of Education rulemaking. DE47-1. No such rulemaking is underway, and the bare theoretical possibility of such rulemaking in the future falls far short of the "substantial likelihood" Plaintiffs bear the burden of proving. *Keohane*, 952 F.3d at 1268 (citation omitted).

12

Plaintiffs are wrong that the State strategically waited until this case was filed to share its interpretation of HB 1557 with Lake County. The State learned of Lake County's mistaken view that HB 1557 restricts library books only because the State was named a defendant alongside the County in this case. The very next day, the State informed the County of its view that the statute does not in fact restrict library books. *see* DE39-1 ¶ 16–17. Nothing about that suggests the County (or the State) intends to reverse its position.

Finally, Plaintiffs contend that the County's change of policy should be disregarded because the County "continu[es] to press" its age restriction's "validity." DE43 at 6 (citation omitted); *see also* DE48 at 6–7. It is unclear how Plaintiffs reach that conclusion—nothing in the County's preliminary-injunction response, Superintendent Kornegray's affidavit, or the School Board's resolution purports to defend the County's age restriction on the merits. *See* DE39-1; DE47-1, 47-3; DE39 at 17 ("The Lake County Defendants are not addressing the Plaintiffs' First Amendment claims here[] because the issue before the Court . . . is moot."). But even if they did, defending an act's constitutionality has "little, if anything, to do . . . with the voluntary-cessation analysis." *Keohane*, 952 F.3d at 1269; *see also Flanigan's*, 868 F.3d at 1262.

## B.    Plaintiffs lack standing to sue the State Defendants.

To demonstrate standing, Plaintiffs must establish "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). Because "standing is not dispensed in gross,"

13

Plaintiffs must demonstrate standing "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Plaintiffs contend that they have standing to sue the State Defendants because the State's threatened enforcement of HB 1557 purportedly caused the County to restrict *Tango*. DE1 ¶ 119. The County's decision, however, is not traceable to the State's enforcement of HB 1557, nor would an "injunction prohibiting [the State's] enforcement . . . be effectual." *Support Working Animals*, 8 F.4th at 1201 (citation omitted).

**1.** To begin with, the State's enforcement of HB 1557 could not have caused Plaintiffs' alleged injuries, because HB 1557 does not even arguably regulate the provision of school library books. The law proscribes only age-inappropriate "*[c]lassroom instruction* . . . on sexual orientation or gender identity." Fla. Stat § 1001.42(8)(c)3. (emphasis added). "Classroom instruction" refers only to the formal and affirmative act of teaching students, and carrying books in a school library is not that.

Starting with the text, a "classroom" is "a place for the formal instruction of students." *Classroom*, *Webster's New International Dictionary* 417 (3d ed. 2002). "Instruction," in turn, means the "action, practice, or profession of teaching," *see Instruction*, *Merriam-Webster's Dictionary* (last visited Aug. 4, 2023), https://www.merriam-webster.com/dictionary/instruction,[11] and "instruct" means "[t]o give knowledge to," *Instruct*, *id.*, https://www.merriam-webster.com/dictionary/instruct, or "[]to impart

---

[11] *See also Instruction*, *American Heritage Dictionary* 666 (2d ed. 1985) (defining "instruction" as "[t]he act, practice, or profession of instructing").

knowledge to, esp. methodically," *Instruct*, *Webster's New International Dictionary* 1288 (2d ed. 1957). The statute thus prohibits only the affirmative transfer of knowledge from a school to a student in a classroom setting. That is why both this Court and the Northern District of Florida have rejected attempts to distort the statute to cover all manner of conduct that is not classroom instruction. *See, e.g.*, *Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *5 (N.D. Fla. Sept. 29, 2022) (non-instructional acts—like teachers having photos of same-sex spouses on their desks, intervening in bullying, presenting a rainbow flag in the classroom—"are not classroom instruction on sexual orientation or gender identity, even if they involved parties who mention a sexual orientation or gender identity"); *Cousins v. Sch. Bd. of Orange Cnty.*, No. 6:22-cv-1312, 2022 WL 18299839, at *9 (M.D. Fla. Oct. 20, 2022) ("discussing [same-sex] families and vacations at school or even on a school assign-ment," "attending a school function in a 'pride' t-shirt," or "discussing their family structure in front of other[s]," is not "classroom instruction").

Like the activities in *Cousins* and *Equality Florida*, a school's provision of library books is not an affirmative act of teaching in a classroom setting. Quite the opposite. When a school provides library books, it offers tools through which students may in-formally and voluntarily teach themselves. *E.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 862 (1982) (plurality op.) ("[T]he only books at issue in this case are *library* books, books that by their nature are optional rather than re-quired reading."); *cf. Roberts v. Madigan*, 702 F. Supp. 1505, 1513–14 (D. Colo. 1989)

(carrying religious books in a *classroom* library violated the Establishment Clause, while carrying the Bible in a *school* library did not), *aff'd*, 921 F.2d 1047 (10th Cir. 1990).

Plaintiffs make this very point. School libraries, they explain, allow students to explore topics "beyond what can be taught . . . in the classroom," DE1 ¶ 5, because library books are "not confined to the curricular material of classroom courses," *id.* ¶ 4. Rather, library books are voluntary "*supplement[s]*" to "the basic readings assigned through the standard curriculum," *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980), not part of the curriculum itself. That is why no reasonable speaker would say that a school formally "instructs" students on Christianity by carrying copies of the Bible in the school library*, cf. Roberts*, 702 F. Supp. at 1513–14 (inclusion of Bible in school library did not violate the Establishment Clause when it was made "available for voluntary perusal" in an informal setting, not in the classroom where "[a]ttendance is compulsory"), or that the State formally "instructs" citizens on "Tolstoy or Dickens" by placing their works on a public library's shelves, *cf. People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005).

Nor does Lake County's mistaken understanding of HB 1557 have any bearing on the statute's meaning. In Florida, "it is the legislature's job to say what the law is, not that of a local school board." *Imhotep-Nguzo Saba Charter Sch. v. Dep't of Educ.*, 947 So. 2d 1279, 1281–82 (Fla. 4th DCA  2007). School boards in fact are "prohibited from promulgating rules at variance with [a] legislation['s]" plain meaning. *W.E.R.  v.  Sch.*

*Bd. of Polk Cnty.*, 749 So. 2d 540, 542 (Fla. 2d DCA 2000). And here, HB 1557's meaning is clear: It applies to formal classroom instruction, not library books.

Because "*Tango* [is] a library book, not part of the school curriculum," DE1 ¶ 10, it does not constitute "classroom instruction" under HB 1557. As a result, Plaintiffs' alleged harms are not traceable to the State's enforcement of HB 1557, but to a "fanciful, paranoid, [and] otherwise unreasonable" view of HB 1557's reach. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

**2.** Even if HB 1557 covered library books, Plaintiffs would still fail to establish standing based on the State's enforcement of HB 1557 because two "independent source[s] would have caused" their alleged harms. *City of South Miami v. Governor of Fla.*, 65 F.4th 631, 645 (11th Cir. 2023) (citation omitted). *First*, the County has an "independent obligation to follow" HB 1557, *id.* at 643, which the County itself has recognized, DE39-1 ¶ 18 (swearing that it will always "direct[]" its "personnel [to] follow the law"). The true "source of the [Plaintiffs'] alleged injury," then, is not the State exerting pressure on the "local" entity enforcing HB 1557, but the local entity's own compliance with HB 1557. *See City of South Miami*, 65 F.4th at 644–45 (injury was traceable not to Governor, but to local officials tasked with enforcing the challenged law, even though Governor could punish local officials for refusing to comply with the law).

*Second*, even if the County's restriction on *Tango* were motivated solely by the possibility of enforcement proceedings against the County under HB 1557, that

17

possibility (and thus the County's motivation) would be undiminished by an injunction against the State Defendants. Were parents no longer free to pursue administrative relief with the Department of Education, that would simply funnel their complaints into the other avenues of relief provide by the statute: a state-court lawsuit for damages and legal fees against the Lake County School Board. *See* Fla. Stat. § 1001.42(8)(c)7.b.(II). That threat of litigation by parents is an independently sufficient reason for the County's decision, so there is no relief the Court can provide. *See Maverick Media Grp., Inc. v. Hillsborough Cnty.*, 528 F.3d 817, 820 (11th Cir. 2008) (redressability not established when injury would continue because of some action not challenged in court); *KH Outdoor, LLC v. Clay Cnty.*, 482 F.3d 1299, 1303–04 (11th Cir. 2007) (similar); *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1304–05 (11th Cir. 2019) (en banc).

**3.** Finally, Plaintiffs cannot trace their injuries to the State's enforcement of HB 1557, because that enforcement is "highly speculative." *Clapper*, 568 U.S. at 411. Plaintiffs identify the special-magistrate procedure in Section 1001.42(8)(c)7.(I) as the method through which the State might enforce HB 1557 against the County. *E.g.*, DE1 ¶ 57. But that unlikely scenario sits at the end of a daisy "chain of contingencies." *Clapper*, 568 U.S. at 410. A parent would first need to identify *Tango* as violating HB 1557; the Commissioner of Education would need to appoint a special magistrate; the special magistrate would need to find that *Tango* violates HB 1557 (*but see supra* 14–17); and the State Board of Education would need to approve that decision, contrary

to the position it has taken here. Plaintiffs have alleged nothing to suggest that any of that would happen, so they cannot trace their harms to the State's enforcement of HB 1557.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM.

### A.   Plaintiffs' First Amendment claims fail.

The Author Plaintiffs claim that the challenged restriction violates their freedom of expression, DE1 ¶¶ 116–27, and the Student Plaintiffs claim that it violates their right to receive information, *id.* ¶¶ 128–54. But the First Amendment is not "a sword" Plaintiffs may use "to compel the government to speak for them." *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021). The government "can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (cleaned up).

That is no less true when the government "exercises editorial discretion in the selection and presentation" of library books. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). There, too, the government "engages in speech activity" and is thus free of judicial scrutiny in the choices it makes. *Id.*; *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (collecting cases). By compiling and presenting material through a government-sponsored medium, the government "communicate[s] messages." *See Forbes*, 523 U.S. at 674 (citation omitted). And because the government has the right to "regulate the content of . . . its own message," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), individuals have

no right to compel the government to include their preferred content in the govern-ment's chosen compilation, be it a flag in a government parade,[12] a candidate in a broadcasted debate,[13] a speaker at a university commencement,[14] or art in a state-spon-sored gallery.[15]

Like those other compilations, the materials made available in a government-operated library are "neither a 'traditional' nor a 'designated' public forum" in which individuals have a cognizable First Amendment interest. *See United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality op.). That is, "a public library's purpose for acquiring" materials is "to provide its patrons with materials of requisite and ap-propriate quality, not to create a public forum for [private parties] to express them-selves." *Id.* at 209 n.4. Accordingly, it is not incumbent upon public libraries to "pro-vide universal coverage," much less to "provide books" of "interest" to "all the people of the community the library serves." *Id.* at 203–04 (cleaned up). "Instead, public li-braries seek to provide materials 'that would be of the greatest direct benefit or interest to the community,'" and "[t]o fulfill their traditional missions, [they] must have broad discretion to decide what material to provide to their patrons." *Id.* at 204. In other words, "the government speaks through its selection of which books to put on the

---

[12] *See Leake*, 14 F.4th at 1253.

[13] *Forbes*, 523 U.S. at 674.

[14] *Id.*

[15] *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998).

shelves and which books to exclude," *Gittens*, 414 F.3d at 28, because that selection reflects the *government's* view about what materials have the "requisite and appropriate quality," *Am. Libr. Ass'n*, 539 U.S. at 204, 206 (plurality op.) (citation omitted); *see also Bryant*, 532 F.3d at 898 (Kavanaugh, J., concurring) (the government speaks when it "compil[es]" the "speech of third parties" in a public library). And because the compilation of library materials is government speech, the First Amendment does not bar the government from making content- and even viewpoint-based choices about what to curate. *See Gittens*, 414 F.3d at 29; *Am. Libr. Ass'n*, 539 U.S. at 204–05 (plurality op.).

That principle applies with even more force in a public *school* library. As Plaintiffs agree, schools must "curate[]" "appropriate reading material" for students, DE1 ¶ 4, to further the government's "educational mission," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). The school library supports that endeavor by "providing materials that properly supplement the basic readings assigned through the standard curriculum." *Zykan*, 631 F.2d at 1308. By curating a school library, the government conveys its view on which books have the "requisite and appropriate quality" to bolster student development. *Am. Libr. Ass'n*, 539 U.S. at 204 (plurality op.) (citation omitted). Allowing private parties to add preferred books to the school library would hijack the government's message. *See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572–73 (1995) (parade organizers not required to include voices they wished to exclude); *Leake*, 14 F.4th at 1253 (same for government parade organizer).

Beyond that, "[a]bsurd results would follow if the First Amendment" gave Plaintiffs a right of access to school children through the medium of their school's library. *Dean v. Warren*, 12 F.4th 1248, 1266 (11th Cir. 2021). Forcing the government "to speak" in a school library "what [it] do[es] not believe on pain of" lawsuit, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2313–14 (2023), would put policy decisions about what to teach in schools in the hands of litigants rather than elected representatives. Not only would the government have to curate those litigants' preferred materials, but at some point, the government would also have to exclude its own preferred materials to make space. Nor can Plaintiffs' claims be cabined to the book at issue in this case. Because the First Amendment itself does not discriminate on the basis of viewpoint, if they prevail here, future plaintiffs will be no less entitled to insist on making Nazi propaganda available. *See Mayer v. Moncroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007). That material, too, is excluded for "partisan and political reasons," DE1 ¶ 11, albeit reasons with which Plaintiffs are unlikely to disagree.

For the same reasons, the Student Plaintiffs are wrong to claim that the First Amendment "'protects the right to receive information and ideas' and . . . is violated by 'the removal of books from the shelves of a school library' for the purpose of 'deny[ing] . . . access to ideas with which [the government] disagree[s].'" DE1 ¶ 129 (citing *Pico*, 457 U.S. at 866–67, 871 (plurality op.)). The government has no constitutional obligation to curate materials with which it disagrees. Because a "listener's right to receive information is reciprocal to the speaker's right to speak," *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015), that right cannot be deployed to

22

interfere with the government's own message. Students certainly have no more right to control what the government puts in its libraries than they do to control the content of a school cheer, *see Dean*, 12 F.4th at 1265–66 (cheerleading is government speech), or the message they communicate while participating in a training practicum, *see Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (same for school practica).

Consistent with that common-sense principle, the Eleventh Circuit has recognized that Plaintiffs' chief authority—the plurality opinion in *Board of Education v. Pico*—was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues" and "establishes no standard." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199–1200 (11th Cir. 2009) (quotations omitted). In addition, *Pico* predates the Supreme Court's government-speech cases, which—as Justice Rehnquist foreshadowed—would have required a different result in that case. *See* 457 U.S. at 920 (Rehnquist, J., dissenting) ("[T]he Court will far better serve the cause of First Amendment jurisprudence by candidly recognizing that the role of government as sovereign is subject to [stricter] limitations than [its] role" as "educator.").

Finally, Plaintiffs' overbreadth claim fails because a "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional,'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted), and Plaintiffs allege only that the restriction of library books violates the First Amendment, DE1 ¶ 173. Accordingly, their "'overbreadth' argument is nothing more than a restatement of the First

Amendment argument they make on their own behalf," *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006) (en banc), and fails for the same reasons.

### B.  HB 1557 is not impermissibly vague.

"[A] civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (citation omitted). HB 1557 does not even approach that standard. *Supra* 14–17. As the Northern District of Florida has explained, HB 1557 is not even "arguably vague," as phrases like "[c]lassroom instruction . . . on sexual orientation or gender identity" are readily understandable to "someone of ordinary intelligence." *Equal. Fla.*, 2022 WL 19263602, at *4.

If anything, HB 1557 provides far more guidance to teachers, students, and parents than other civil restrictions that likewise regulate only the conduct of government employees. For example, in *California Teachers Association v. State Board of Education*, the Ninth Circuit held that a law requiring "the language of instruction used by the teaching personnel [to be] overwhelmingly the English language" was not vague. 271 F.3d 1141, 1145, 1152–53 (9th Cir. 2001). The Sixth Circuit likewise upheld a school rule that proscribed "conduct unbecoming a teacher." *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 664–66 (6th Cir. 1987). And the Supreme Court has held that the phrase "for such cause as will promote the efficiency of the service" gave employees sufficient notice of grounds for termination. *Arnett v. Kennedy*, 416 U.S. 134, 158–64 (1974) (plurality op.). Even more than those laws, HB 1557 provides clear notice of its scope in "terms of common understanding." *Cal. Tchrs. Ass'n*, 271 F.3d at 1152.

24

Like every statute, the bill will be amenable to various interpretative questions, but that is no constitutional defect. *See Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994) ("If run-of-the-mill statutory ambiguities *were* enough to violate the Constitution, no court could ever clarify statutes through judicial interpretation . . . .").

## CONCLUSION

The Court should dismiss all claims against the State Defendants.

Respectfully submitted,

ASHLEY MOODY
  *Attorney General*
HENRY C. WHITAKER (FBN 1031175)
  *Solicitor General*
DANIEL W. BELL (FBN 1008587)
  *Chief Deputy Solicitor General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
*david.costello@myfloridalegal.com*

*/s/ David M. Costello*
DAVID M. COSTELLO (FBN 1004952)
  *Deputy Solicitor General*

*Counsel for the State Defendants*

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 3.01(g), undersigned counsel conferred with counsel for Plaintiffs via email about the relief sought in this motion. Plaintiffs oppose the motion.

## CERTIFICATE OF SERVICE

On this 4th day of August, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ David M. Costello*
Deputy Solicitor General

25