UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Peter Parnell; Justin Richardson; and B.G., *by and through her parent Raymond Guillory*,

        Plaintiffs,

        v.

School Board of Lake County, Florida; Diane Kornegay, *Superintendent of the Lake County School District, in her official and individual capacities*; School Board of Escambia County, Florida; Keith Leonard, *Superintendent of the Escambia County School District, in his official and individual capacities*; Manny Díaz, Jr., *Florida Commissioner of Education, in his official and individual capacities*; Ben Gibson, *chair of the Florida State Board of Education, in his official and individual capacities*; Ryan Petty, *vice chair of the Florida State Board of Education, in his official and individual capacities*; Monesia Brown, *a member of the Florida State Board of Education, in her official and individual capacities*; Esther Byrd, *a member of the Florida State Board of Education, in her official and individual capacities*; Grazie P. Christie, *a member of the Florida State Board of Education, in her official and individual capacities*; Kelly Garcia, *a member of the Florida State Board of Education, in*

Case No. 5:23-cv-00381 (BJD) (PRL)

**CHALLENGE TO THE CONSTITUTIONALITY OF FLORIDA STATUTES § 1001.42(8)(c)(3)**

**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF REQUESTED**

**DECLARATORY RELIEF REQUESTED**

**DEMAND FOR A JURY TRIAL**

*her official and individual capacities*; and MaryLynn Magar, *a member of the Florida State Board of Education, in her official and individual capacities*,

Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Peter Parnell; Justin Richardson; and B.G., by and through her parent Raymond Guillory, through their attorneys, Selendy Gay Elsberg PLLC and Kenny Nachwalter, P.A., for their complaint against the School Board of Lake County, Florida; Diane Kornegay, Superintendent of the Lake County School District, in her official and individual capacities; the School Board of Escambia County, Florida; Keith Leonard, Superintendent of the Escambia County School District, in his official and individual capacities; Manny Díaz, Jr., Florida Commissioner of Education, in his official and individual capacities; Ben Gibson, chair of the Florida State Board of Education, in his official and individual capacities; Ryan Petty, vice chair of the Florida State Board of Education, in his official and individual capacities; Monesia Brown, a member of the Florida State Board of Education, in her official and individual capacities; Esther Byrd, a member of the Florida State Board of Education, in her official and individual capacities; Grazie P. Christie, a member of the Florida State Board of Education, in her official and

2

individual capacities; Kelly Garcia, a member of the Florida State Board of Education, in her official and individual capacities; and MaryLynn Magar, a member of the Florida State Board of Education, in her official and individual capacities, allege as follows:

## NATURE OF ACTION

1.      "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

2.      More than sixty years after the Supreme Court of the United States decided *Brown v. Board of Education*, universal public education continues to be one of our country's greatest attributes. Broad exposure and freedom to explore and examine innumerable areas of scholarship, art, and science, together with the rigorous development of critical thinking skills, are essential to training our young citizens for the privileges and responsibilities necessary for full participation in a high-functioning democratic society. Any attempt to diminish public education through misinformation and censorship directly threatens both our young people and the quality and competitiveness of our

democracy.

3.     Florida has long guaranteed broad and free public education. Florida public schools promise to develop students into well-educated young adults who are prepared to embrace all of the challenges, privileges, and responsibilities of American citizenship, to live in an increasingly diverse world, and to compete successfully in the Florida, national, and global economies. Millions of parents choose Florida's public schools to educate their children consistent with this promise.

4.     Florida's public schools also offer rich stores of information designed to assist students in developing their own academic strengths while deepening intellectual curiosity and analytical rigor. Florida public schools offer libraries with appropriate reading material for all students, curated by expert educators. They provide valuable reading material that is not confined to the curricular material of classroom courses. The robust programmatic and material offerings of public school libraries in Florida are a cornerstone of the state's commitment to education.

5.     Florida public school libraries enrich students' educational experiences by fostering a love of reading and cultivating a culture of inquiry and literary appreciation. They encourage the independent exploration of ideas by providing an expansive range of literature and informational materials that allow students to explore subjects of personal and academic interest beyond

4

what can be taught in the time students spend in the classroom. As the Supreme Court has recognized, "'students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding.' The school library is the principal locus of such freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982) (plurality opinion) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

6.     In Lake County, Florida, and Escambia County, Florida, those public school libraries historically included the award-winning children's book *And Tango Makes Three* ("*Tango*"). Many school districts nationwide have *Tango* on the shelves of their public school libraries, thereby permitting schoolchildren from K–12 to have continuous free access to read and enjoy this well-known and well-loved book.

7.     *Tango* tells the true story of two male penguins in New York City's Central Park Zoo. The penguins, named Roy and Silo, formed an enduring pair bond and, with the help of a conscientious zookeeper, adopted, hatched, and raised a penguin chick named Tango. Americans eagerly flocked to the Zoo each year to see the young penguin.

8.     *Tango* is a children's book. Its publisher recommends it for children between four and eight years old, but it is appropriate for all ages. It tells a true and heartwarming story, and it teaches students about animal behavior, adoption, diversity among family structures, and responsible family values.

The book is factually accurate and contains no vulgarity, obscenity, or content that would not befit a school environment. The book has been acclaimed by numerous literary groups. A copy of the book is attached hereto as Exhibit A.

9.     But in or before December 2022 and February 2023, the Lake County and Escambia County School Boards, respectively, decided to deprive children of access to this award-winning and beloved work. The Lake County Board barred access to *Tango* for all students in kindergarten through third grade, expressly stating that its decision was based on Florida's 2022 House Bill 1557, codified at Fla. Stat. § 1001.42(8)(c)(3), a vague and overbroad statute that discriminates based on content and viewpoint by barring "[c]lassroom instruction … on sexual orientation or gender identity." In Escambia County, *Tango* was physically pulled from school library shelves, again based on the statute and an abundant record of discriminatory animus. This decision followed a detailed review process during which local elementary-school educators and community members found the book highly appropriate for a school library environment. But the Escambia County School Board ignored this review and removed the book, repeatedly invoking § 1001.42(8)(c)(3).

10.     The school districts made no attempt to disguise the reason for their decisions: They restricted students below the fourth grade from reading *Tango* in Lake County and pulled the book off school library shelves in Escambia County because of § 1001.42(8)(c)(3), as well as the content and viewpoint

6

expressed in the book. They cited no legitimate pedagogical reason for their decisions—nor could they: *Tango* was a library book, not part of the school curriculum; the book is factually accurate, non-vulgar, and non-obscene; *Tango* had previously stood on school library shelves; and educators within Escambia County found the book appropriate school library material, only to be overruled by officials who disapprove of *Tango* for illegitimate, narrowly partisan, political reasons.

11.    The removal of *Tango*—including its de facto removal from the hands of kindergarten through third-grade students in Lake County schools, who were barred from accessing the book in their school libraries, and its physical removal from Escambia County elementary school libraries—violates the First Amendment to the United States Constitution. By discriminating based on content and viewpoint, it infringes the authors' right to freedom of expression. By restricting access to a book, which was previously freely available, for narrowly partisan, political reasons, it infringes students' right to receive information.

12.    The authors wrote *Tango* to spread a message of tolerance and equal treatment. They have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own—and B.G. wishes to read *Tango* to learn about those very subjects.

13.    Schoolchildren are a uniquely important audience for the historical and scientific account *Tango* offers and the message the authors intend the book to convey. Because *Tango* was previously available in libraries and pulled or restricted based on its content and viewpoint, its removal infringes B.G.'s right to receive information.

14.    Because *Tango*'s removal in Lake and Escambia Counties was specifically motivated and justified by the specter of enforcement of the vague and discriminatory § 1001.42(8)(c)(3), that statute is unconstitutional as applied to these facts.

15.    Plaintiffs seek to remedy both the harm already done to them under § 1001.42(8)(c)(3) and the ongoing and future harm they will suffer under the statute. They seek to restore *Tango* to public school libraries and to make the book accessible to students of all ages in Lake County and Escambia County public schools.

16.    Plaintiffs bring this suit to vindicate their First and Fourteenth Amendment rights and to stop the abhorrent and discriminatory practice of removing books based on partisan, non-pedagogical motivations.

## THE PARTIES

### I.    Author Plaintiffs

17.    Plaintiff Peter Parnell is a playwright, television writer, and children's book author. He was a co-producer and executive story editor on the

8

television show *The West Wing* and has written plays for Broadway and Off-Broadway. Parnell is a co-author of *And Tango Makes Three*. He is a resident of New York.

18.    Plaintiff Justin Richardson is an award-winning clinical and academic psychiatrist and a children's book author. He and Parnell co-wrote the children's book *Christian, the Hugging Lion*—based on a true story about a lion born in captivity and reintroduced to the wild—which was published in 2010. Richardson is a co-author of *And Tango Makes Three*. He is a resident of New York.

19.    Plaintiffs Parnell and Richardson are married to one another. They live together in New York City with their daughter. They are one of more than 700,000 married same-sex couples in the United States. Their daughter is one of at least 200,000 American children growing up with same-sex parents.

## II.    Student Plaintiff B.G.

20.    B.G. was born and raised in Escambia County, Florida. She resides with her family in Pensacola, Florida, a city in Escambia County. B.G. is eight years old and is a third-grade student at Warrington Elementary School, the same school that her father attended. She brings suit by and through her parent, Raymond Guillory.

21.    B.G. loves animals, so much so that she wants to be a veterinarian when she grows up. When B.G. was three years old, she convinced her father

to adopt a dog from a local rescue; the family now includes multiple dogs and cats. Aware of B.G.'s interest in animals from an early age, B.G.'s grandmother made her a large collection of cloth animal figurines—all of which B.G. was proudly able to identify at just two years of age.

22.    B.G. is a voracious reader and entered Warrington Elementary School's gifted program last year. While she used to read books together with her father, Raymond Guillory, each week, B.G. has been reading on her own for approximately the past two years.

23.    The majority of books that B.G. currently reads are about animals, including books about insects, dinosaurs, dogs, and sharks. B.G. uses books to learn about animal species from across the world: B.G. would like to read *Tango* in part because she wants to learn more about penguins, which are not native to Florida.

24.    Art is one of B.G.'s favorite subjects in school, and she has a particular affinity for books with detailed illustrations. B.G. primarily depicts animals in her drawings: B.G. would like to read a copy of Tango in part because of the book's beautiful drawings of penguins.

25.    B.G. also has LGBTQ+ family members and is interested in LGBTQ+ issues. She is interested in *Tango*'s depiction of a same-sex pair bond in nature and of adoption by same-sex parents. In or around March 2023, B.G. endeavored to check out *Tango* and asked her father if she could do so. Her

father accurately informed her that the book was no longer available through her school library because it had been removed: Warrington Elementary School is a public school located in Escambia County, and Escambia County Schools pulled *Tango* from library shelves in February of 2023. B.G.'s desire to check out and read *Tango* persists today. She intends to check out and read the book if the book is restored to the Warrington Elementary School library.

## III. School Defendants

### A. Escambia County Defendants

26.     Defendant the School Board of Escambia County, Florida (the "Escambia County Board") is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.* It operates in Escambia County, Florida, overseeing a public school district that serves over 37,000 primary and secondary school students. Its powers and duties include implementing and enforcing § 1001.42(8)(c)(3). *See id.* § 1001.42(8)(c)(3), (7); *see also id.* § 1001.42(15).

27.     Defendant Keith Leonard is the Superintendent of the Escambia County School District. In this role, Leonard "[e]xercise[s] general oversight over the district school system" and enforces rules adopted by the Escambia County Board. *Id.* § 1001.49. He is sued in his official and individual capacities.

### B. Lake County Defendants

28.     Defendant School Board of Lake County, Florida (the "Lake County Board"), is a district school board organized and governed pursuant to

11

Fla. Stat. § 1001.34 *et seq.* It operates in Lake County, Florida, overseeing Lake County Schools, a public school district that serves over 45,000 primary and secondary school students. Its powers and duties include implementing and enforcing § 1001.42(8)(c)(3). *See id.* §§ 1001.42(8)(c)(3), (7); *see also id.* § 1001.42(15).

29.     Defendant Diane Kornegay is the Superintendent of Lake County Schools. In this role, Kornegay "[e]xercise[s] general oversight over the district school system" and enforces rules adopted by the Lake County Board. *Id.* § 1001.49. She is sued in her official and individual capacities.

## IV.     Florida State Defendants

30.     Defendant Manny Díaz, Jr., is Florida's Commissioner of Education—the chief executive of the Florida Department of Education. *See* Fla. Const. art. IX, § 1; Fla. Stat. § 20.15(2). As Commissioner, Díaz is responsible for enforcing § 1001.42(8)(c)(3). *See* Fla. Stat. § 1001.42(8)(c)(7)(b)(I). He is sued in his official and individual capacities.

31.     Defendant Ben Gibson is the Chair of the Florida State Board of Education (the "State Board"). The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to § 1001.42(8)(c)(3). Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State

12

Board's chair is responsible for enforcing § 1001.42(8)(c)(3). Gibson is sued in his official and individual capacities.

32.     Defendant Ryan Petty is the Vice Chair of the State Board. The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to § 1001.42(8)(c)(3). Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's vice chair is responsible for enforcing § 1001.42(8)(c)(3). Petty is sued in his official and individual capacities.

33.     Defendants Monesia Brown, Esther Byrd, Grazie P. Christie, Kelly Garcia, and MaryLynn Magar are members of the State Board. The State Board oversees primary and secondary public education in Florida. Fla. Const. art. IX; Fla. Stat. § 20.15(1). The State Board supervises and regulates local public schools, including through the adoption of rules. It administers, enforces, and implements regulations pursuant to § 1001.42(8)(c)(3). Fla. Stat. § 1001.42(8)(c)(7)(b)(I). The State Board's members are responsible for enforcing § 1001.42(8)(c)(3). They are sued in their official and individual capacities.

## JURISDICTION

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and laws of the United States.

35.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) because Plaintiffs were deprived, under color of state law, of rights, privileges, and/or immunities secured by the Constitution of the United States.

## VENUE

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, the Lake County Defendants are residents of the Middle District of Florida, and, on information and belief, all other Defendants are residents of Florida.

37.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in the Middle District of Florida.

38.    Venue is proper in the Ocala Division because, on information and belief, the Lake County Defendants are residents of Lake County, Florida, and because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in Lake County, Florida.

## FACTUAL ALLEGATIONS

**I.    Florida Enacts Fla. Stat. § 1001.42(8)(c)(3), Targeting Disfavored Speech**

39.    Florida law guarantees that "all K-12 public school students are entitled to a uniform, safe, secure, efficient, and high quality system of education, one that allows students the opportunity to obtain a high quality

14

education" that is "made available without discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status." Fla. Stat. §§ 1002.20(1), (7).

40.     But in 2022, Florida did violence to its guarantee of "high quality education" by passing H.B. 1557, a vague and harsh statutory scheme also known as the Parental Rights in Education Act (the "Act").

41.     Section 1 of the Act provides, in relevant part, that "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." 2022 Fla. Laws ch. 22 (codified at Fla. Stat. § 1001.42(8)(c)(3)) (the "Ban").[1]

42.     In 2023, Florida made matters worse by passing a follow-on bill, H.B. 1069. Section 3 of that bill expanded the Ban by providing, in relevant part, that "[c]lassroom instruction by school personnel or third parties on

---

[1] The Florida Board of Education adopted a rule aimed at educators that mirrored the Ban by making it professional misconduct for educators to provide classroom instruction relating to sexual orientation or gender identity for kindergarten through third-grade students. *See* Fla. Admin. Code r. 6A-10.081(6). It has since adopted a new rule that expands the prior rule to also cover students in prekindergarten and students in grades four through twelve, aside from two exceptions for fourth- through twelfth-grade students. *See id.* r. 6A-10.081(7). That rule took effect on May 23, 2023.

sexual orientation or gender identity may not occur in **prekindergarten** through **grade 8**," with two narrow exceptions for health education.[2] 2023 Fla. Laws ch. 105 (emphasis added) (codified at Fla. Stat. § 1001.42(8)(c)(3)). H.B. 1069 left the substantive provisions of the Ban untouched and, in relevant part, merely replaced "kindergarten" with "prekindergarten" and "grade 3" with "grade 8." Its facial purpose and effect are to apply the restrictions of H.B. 1557 to students from prekindergarten through eighth grade. H.B. 1069 took effect, and thereby expanded the Ban, on July 1, 2023. *Id.* § 9.

43.     The Ban is enforced by draconian penalties. In November 2022, the State Board enacted regulations implementing the Act. A Florida educator who intentionally violates the Ban now faces revocation of their teaching license. Fla. Admin. Code r. 6A-10.081(2). By threatening teachers, the Ban threatens students' ability to receive a meaningful, robust education.

---

[2] The first exception requires teaching sixth- through twelfth-grade students "the benefits of sexual abstinence as the expected standard and the consequences of teenage pregnancy." Fla. Stat. § 1003.42(2)(n)(3). The second exception allows district school boards to "provide [health education] instruction [regarding AIDS]" and requires that "[t]hroughout instruction [regarding AIDS], sexually transmitted diseases, or health education [about] human sexuality, a school shall … [t]each abstinence from sexual activity outside of marriage as the expected standard for … students while teaching the benefits of monogamous heterosexual marriage." Fla. Stat. § 1003.46. These exceptions are inapplicable to *Tango* because it is a children's library book that, on information and belief, is not part of the curriculum in Lake County or Escambia County health education classes.

44.    In addition, among other things, any "concern[ed]" or litigious parent may sue their school district over a violation of the Act. If they win, they may recover fees and costs. If the school district wins, it may not do the same. The prospect of such enforcement has a chilling effect on protected speech.

45.    The Ban is also enforced directly by school boards, which "shall exercise all powers and perform all duties" under § 1001.42(8)(c)(3). Fla. Stat. § 1001.42.

46.    The Ban does not expressly mention books or school libraries. But neither does it expressly exempt them. Because educational professionals and schools who are found to violate the Ban face crushing liability and loss of their livelihoods, the Ban has had a chilling effect on speech, which directly and negatively impacts children, authors, and public school libraries, not to mention the quality of Florida public education. The Ban's vagueness, in combination with its harsh penalties, make it more likely to be applied expansively—such as to public school libraries—at the expense of the authors' free speech rights and the students' right to receive information.

47.    The Ban has not only created a vague and harsh statutory regime; it has opened Florida public schools to the well-known harms associated with ideological censorship. Political and partisan censorship is the intent of the Ban. The Act's sponsor, Senator Dennis Baxley, indicated that the goal of the

Ban was to stop "the departure from the core belief systems and values."[3] In discussing the Ban during April 2022, Governor Ronald DeSantis likewise stated that "[t]hings like woke gender ideology have no place in the schools period."[4] Florida officials concede that the Ban is designed to censor or eliminate viewpoints disfavored by the State government from Florida public school libraries.[5]

48. Among other things, the Ban is designed to discriminate against the viewpoint that same-sex relationships and families with same-sex parents

---

[3] Fla. S., recording of proceedings, at 08:09:30–08:12:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

[4] Fox News, *DeSantis: Education not indoctrination*, at 6:06–40, YouTube (Apr. 29, 2022), https://www.youtube.com/watch?v=12IVeeq2ydk [https://perma.cc/Q5N9-HSFD].

[5] As pictured below, Christina Pushaw, a spokesperson for Governor DeSantis, recently tweeted the image of a hand waving goodbye in response to the news that the majority of queer parents are considering leaving Florida because of H.B. 1557:



exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

49.     The patent content and viewpoint discrimination intended by the Ban became clear during the legislative process. By way of example, during deliberations on the Act, Senator Tina Polsky proposed an amendment to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality." That amendment was voted down.[6] An amendment proposed by Republican Senator Jeff Brandes would have replaced "sexual orientation or gender identity" with "human sexuality or sexual activity." It too was voted down, despite Senator Brandes imploring his colleagues that "[i]f the intent [of H.B. 1557] is not to marginalize anyone, let's make sure we aren't."[7]

50.     The State thus proceeded with a Ban that uses the terms "sexual orientation" or "gender identity" without defining them (much less defining them to include all sexual orientations). Because of its imprecision, the Ban does not equally affect viewpoints on all sexual orientations. Instead, the Ban was intended invidiously to discriminate against a particular disfavored

---

[6] Fla. S., recording of proceedings, at 04:50:30–04:55:00 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

[7] Fla. S. Comm. on Appropriations, recording of proceedings, at 01:04:00–01:07:00 (Feb. 28, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_3xdlmr8t-202202281030&Redirect=true.

viewpoint and, through its vagueness, has been discriminatorily enforced to target only that disfavored viewpoint.

51.    The Ban's intentional vagueness did not end with its failure to define "sexual orientation" and "gender identity." It also uses the vague term "classroom instruction." Senator Lauren Book proposed an amendment that would have helped to resolve what constitutes "classroom instruction" under H.B. 1557 by excluding from that definition "instruction or discussion relating to" "family structures," "objective historical events," "bullying prevention," "discussions between students," and "questions asked by students and any answer."[8] This amendment was also voted down. The Ban did not adopt any definition of "classroom instruction," magnifying its chilling effect by leaving educators to wonder whether it applied to any mention of LGBTQ+ teachers' families, to teachers' references to students who have come out as LGBTQ+, to discussions during extracurricular activities, or to books and other materials in school libraries.

52.    The legislative process also made clear that legitimate pedagogical concerns were not the driving force behind the Ban. Had they passed, the amendments proposed by Senator Randolph Bracy and Representative Marie

---

[8] Fla. S., recording of proceedings, at 05:23:30–05:33:30 (Mar. 7, 2022), https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-202203071000&Redirect=true.

Paule Woodson would have clarified that H.B. 1557 "does not apply to any dis-
cussion between a student who identifies as transgender, gender nonconform-
ing, non-binary, or otherwise LGBTQ+ and their peers." Instead, the final ver-
sion of H.B. 1557 intentionally left open the ominous possibility that it required
school districts to police conversations between students about their LGBTQ+
identities.[9] This threat impedes, rather than facilitates, a productive learning
environment.

53.    The threat of the Ban's enforcement thus has a chilling effect that
limits discussion of and the provision of school resources on factually accurate,
age-appropriate topics, such as the simple fact that LGTBQ+ people and ani-
mals exist.

54.    As set forth below, the Ban has been applied in a discriminatory
fashion to eliminate or restrict access to pedagogically appropriate material in
public school libraries, with no legitimate justification. The Ban was invoked
as a basis to restrict kindergarten through third-grade students from accessing
*Tango* in public school libraries in Lake County and to remove *Tango* from

---

[9] Fla. S., recording of proceedings, at 05:33:30–05:37:00 (Mar. 7, 2022),
https://www.flsenate.gov/media/VideoPlayer?EventID=1_4gaky6b9-
202203071000&Redirect=true; Fla. H.R, recording of proceedings, at 03:47:30–
03:54:00                     (Feb.                     22,                     2022),
https://www.flsenate.gov/media/VideoPlayer?EventID=1_1az3it1i-
202202221300&Redirect=true.

school libraries in Escambia County.

## II. The Story of Tango and the Authorship of *And Tango Makes Three*

55.   *Tango* tells the true story of Roy and Silo, two male chinstrap penguins that resided at the Central Park Zoo. By 2004, Roy and Silo had been "completely devoted to each other" for "nearly six years."[10] Roy and Silo are pictured below:



56.   A conscientious zookeeper noticed the relationship between the

---

[10] Dinitia Smith, *Love That Dare Not Squeak Its Name*, N.Y. Times (Feb. 7, 2004), https://www.nytimes.com/2004/02/07/arts/love-that-dare-not-squeak-its-name.html [https://perma.cc/K79J-THKF].

two penguins and correctly concluded that the penguins had formed a pair bond. The zookeeper observed the pair building a nest and attempting to incubate an egg-shaped rock. "At one time, [Roy and Silo] seemed so desperate to incubate an egg together that they put a rock in their nest and sat on it, keeping it warm in the folds of their abdomens."[11]

57.     To test their readiness to incubate a live egg, the zookeeper first gave the pair a dummy egg and observed their incubation behaviors. Betty and Porkey, another penguin pair, had previously hatched their own eggs but had never been able to successfully hatch more than one at a time. When Betty laid two fertile eggs, the zookeeper then gave one egg to Roy and Silo to allow both eggs to hatch and both chicks to thrive. Roy and Silo successfully incubated the egg and adopted and raised the resulting chick, which zookeepers named Tango.

58.     News outlets across the country reported on Roy, Silo, and Tango. When the Author Plaintiffs read about Roy, Silo, and Tango, they recognized that the penguins' tale was perfectly suited to a children's story. In their view, this was "a way to talk about this kind of family that [would] work at the level of a picture book and not a didactic 'it's O.K. to be different' story."[12]

_____

[11] *Id.*

[12] Jennifer 8. Lee, *A Baby for the Gay Authors Behind the Daddy Penguins*, N.Y.            Times            (Oct.            2,            2009),

59.    The Authors wrote *Tango*, and Simon & Schuster published it in 2005. It has since been published in 15 languages and on four continents. Simon & Schuster markets it as a fiction book most suitable for young children but appropriate for all ages.

60.    *Tango* is appropriate for children. It contains no obscenity or vulgarity of any kind. It does not contain any offensive language or sexually explicit content.[13]

61.    *Tango* is factually accurate. Roy, Silo, and Tango were all real, and the story of Roy and Silo's bond and Tango's adoption is nonfiction.[14] It is a biological fact that same-sex behavior is "a nearly universal phenomenon in the animal kingdom."[15] Tango offers children a heartwarming and accessible introduction to an important area of animal science by telling the true story of easily relatable animals at a popular zoo. *Tango* helps children to learn about science through simple, non-vulgar words and illustrations.

---

https://archive.nytimes.com/cityroom.blogs.nytimes.com/2009/10/02/a-baby-for-the-gay-authors-behind-the-daddy-penguins/        [https://perma.cc/C5EE-7K23].

[13] *See generally* Ex. A, Justin Richardson & Peter Parnell, *And Tango Makes Three* (2005).

[14] *See id.* at 32 (describing the factual basis of the story).

[15] *Same-Sex Behavior Seen in Nearly All Animals, Review Finds*, Sci. Daily (June 17,                                                                    2009), https://www.sciencedaily.com/releases/2009/06/090616122106.htm [https://perma.cc/PZA8-BQJ9].

62.    *Tango* is lauded. It is an American Library Association Notable Children's Book, a Bank Street Best Book of the Year, a Nick Jr. Family Magazine Best Book of the Year, an ASPCA Henry Bergh Children's Book Award winner, and a BookSense Children's Pick. It has received the Gustavus Myers Outstanding Book Award and the Sheffield Children's Book Award, and has received starred reviews in Kirkus Reviews, School Library Journal, Publishers Weekly, and Booklist. *Tango* is an Amazon Teachers' Pick and has been one of the top-selling books in Amazon's "Children's Books on Adoption" category for over 15 years. The book's cover is pictured below:



63.    *Tango* takes no position on policy. It does not lecture, hector, or tell children how to feel.

25

64.   *Tango*, instead, depicts a family just like the Authors' and hundreds of thousands of other families nationwide—two same-sex parents raising an adopted child together.[16] Its meaning, message, and viewpoint are simple: *Tango* says that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

65.   The Authors have a broader goal for *Tango* than merely selling copies or achieving critical acclaim. They seek to ensure the book is available to all interested readers, including in public school libraries for children who wish to learn about animal behavior, adoption, or family structures.

66.   *Tango* has been available in public school libraries nationwide for more than 15 years. There is no evidence that *Tango*'s presence in these libraries has ever caused disciplinary disruptions or harm of any kind at any school, anywhere, at any time.

## III.   The Lake County Defendants Restrict Students' Access to *Tango*, Citing H.B. 1557

67.   On or before December 11, 2022, Lake County Schools—administered by the Lake County Board—barred kindergarten through third-grade students in the district from accessing *Tango* in their public school libraries.

68.   In response to a public record request, the only explanation Lake

---

[16] There are also five million Americans who were adopted, like Tango.

County Schools provided is that *Tango* was "[a]dministratively removed due to content regarding sexual orientation/gender identification prohibited in HB 1557."[17] Speaking to media, Lake County Schools has stuck to its line: *Tango*'s presence on the shelves violates Florida law.[18]

69.    As recently as May 29, 2023, as pictured below, Lake County's school library catalog, Destiny, declared that *Tango* was restricted because of the Ban and identified "homosexuality" as among the book's subjects. A screenshot of the catalog, annotated with red boxes, is below:

[17] Ex. B (Lake County Schools' e-mail response to a public records request regarding "book challenges, reviews, removals, and restrictions.").

[18] Joshua Q. Nelson, *Florida school district bans book about real-life gay penguin relationship, citing Parental Rights law*, Fox News (Jan. 10, 2023) (school official quoted as saying *Tango* was removed "in alignment with Florida HB 1557"), https://www.foxnews.com/media/florida-school-district-bans-book-about-real-life-gay-penguin-relationship-citing-parental-rights-law [https://perma.cc/T2ZJ-Y646].



70.    Indeed, a search of the same catalog revealed that Lake County previously restricted 40 books, including *Tango*, "per HB 1557."[19] Thirty-seven out of these 40 books have been given labels by the library system as including content related to "[h]omosexuality," "[g]ay youth," "[g]ay parents," "[t]ransgender people," and other such terms associated with LGBTQ+

---

[19] *See* Ex. C (results of a search for "HB 1557" in the catalogs of all Lake County public school libraries) (last visited June 19, 2023). Although there are 44 results shown in Exhibit B, four of the results are duplicates. Shortly after the filing of this case, Lake County purportedly removed restrictions on some of these books, and thus the library catalog presently does not reflect all previous restrictions.

individuals. Three additional restricted books have not been given such labels by the library system, but they also contain content relating to LGBTQ+ issues and themes.[20] Just like *Tango*, each of the other 39 restricted books expresses a message of inclusion and tolerance, or simply acknowledges the existence, of LGBTQ+ individuals—a viewpoint disfavored by the Lake County Defendants.

71.    On June 21, 2023—just one day after the commencement of this litigation—counsel for the State Defendants contacted counsel for the Lake County Defendants and provided a copy of a brief filed by the State Defendants six months earlier in another litigation, which purportedly claims that § 1001.42(8)(c)(3) does not apply to school library books. The State Defendants did not share the brief, or the position taken therein, with the Lake County Defendants until after the commencement of this litigation. Similarly, to date, the State Defendants have not engaged in any rulemaking or issued any official guidance to Florida school boards notifying them that § 1001.42(8)(c)(3) does not apply to school library books.

---

[20] *Rise Up!: The Art of Protest* by Jo Rippon is described in the Destiny catalog system as including "[p]hotographs of protest posters celebrat[ing] the ongoing fight for … LGBT rights." The Kirkus Reviews description of *We Move the World* by Kari Lavelle on the Destiny catalog system states that "[t]he adult achievements celebrated [in the book] are progressive and diverse[,] … [including] Brazil's Pride parade … and the AIDS Memorial Quilt." Finally, *Milo Imagines The World* by Matt de la Peña contains an illustration of two people in dresses (one of whom is referred to as a woman in the story and the other whose gender is never identified) getting married to each other.

72.   Purportedly based on this June 21, 2023 communication, Defendant Kornegay claims to have removed the grade-level restriction on *Tango* and other restricted books. She has insisted that the Lake County Defendants' restriction of *Tango* represented "an attempt to follow [§ 1001.42(8)(c)(3)]" and was "further supported by" Florida Department of Education guidance, which "instructed Florida school districts to 'err on the side of caution' when selecting and maintaining age appropriate school library books." The Lake County Defendants pointed to a "manual about educators acting carefully and conservatively and [*sic*] implementing HB 1557" and stated that "[g]iven the penalties for violating 2022 House Bill 1557, a statement from the Florida Department of Education to err on the side of caution was not ignored." In sum, the Lake County Defendants asserted that they restricted *Tango* because that is what they believed the law required but, upon the State Defendants' communication to them, they learned the State's litigation position that "[their] understanding was apparently incorrect," and reversed course in response to the State Defendants' "interpretation."

73.   Despite Defendant Kornegay's purported decision, *Tango* remains prominently marked "RESTRICTED FROM CLASSROOM INSTRUCTION" in the Lake County Schools library catalog. A current screenshot of the catalog, annotated with a red box, is below:



74.     After the July 26, 2023 oral argument on a motion for a prelimi-
nary injunction in this action, but before this Court issued a decision, the Lake
County School Board adopted a resolution, in which the Board stated that it
"ratifie[d] the prior administrative decision to align the Lake County school
district with the prevailing interpretation of Section 1001.42(8)(c)3 [*sic*], Flor-
ida Statutes." The resolution did not specify what the "prior administrative
decision" was, nor did it explain what the "prevailing interpretation" of Sec-
tion 1001.42(8)(c)(3) is. The resolution prohibited Lake County public school
personnel from following further informal guidance from the State Defendants
(but not earlier informal guidance or future formal guidance) and required
school personnel to follow state laws and rules promulgated by the State Board

of Education.

75.    Like Defendant Kornegay's decision, the Lake County School Board's decision to adopt this vague resolution while a motion was under advisement was ad hoc, unreasoned, designed to moot this litigation, and did not represent an unambiguous government policy. Nor have the Lake County Defendants evinced any commitment to their purportedly changed course: *Tango* remains prominently marked "RESTRICTED FROM CLASSROOM INSTRUCTION" in the Lake County Schools library catalog.

76.    In addition to *Tango*'s continued restrictions, Lake County has marked another book previously restricted under § 1001.42(8)(c)(3) the same way. Thirty-two of the previously restricted LGBTQ+-related books remain tagged as "review pending," and one previously restricted book is no longer listed in the school library catalog at all. A screenshot of one of the restricted books' catalog entries, annotated with a red box, is below:



77.    These continued restrictions only on books depicting LGBTQ+ history, families, and characters reveal that Defendant Kornegay's actions and

the Lake County School Board's post-hearing resolution were unreasoned, ad hoc, pretextual, designed solely to moot this litigation, and have not affected the Lake County Defendants' pattern of viewpoint discrimination.

78.    In applying § 1001.42(8)(c)(3) to restrict access to *Tango* in public school libraries, Lake County Schools, the Lake County Board, and the Board's executives discriminated on the basis of content and viewpoint: They barred students from accessing *Tango* because of its content—namely, the story of a same-sex animal couple with an adopted child—and its expressed viewpoint—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

79.    If Lake County Schools were not engaging in viewpoint discrimination, then it would not have limited its restriction of books to those exclusively featuring LGBTQ+ characters or discussing LGBTQ+-related content such as Pride parades. Nor would it continue to restrict 34 of those same books today. It would have barred students below the fourth grade from reading other books about animal behavior, families, or adoption that lacked any LGBTQ+-related content. But Lake County Schools did no such thing, enforcing § 1001.42(8)(c)(3) solely—in 40 different instances—against books depicting or endorsing the full equality of LGBTQ+ people.

80.    On information and belief, Lake County Schools has never cited,

or considered citing, § 1001.42(8)(c)(3) to restrict books featuring heterosexual families or relationships. The school district's enforcement of the Ban has suppressed one and only one point of view.

81.    The viewpoint-discriminatory restriction of access to 40 books; the continued viewpoint-discriminatory restriction of access to 34 books; and the ambiguous, unreasoned decisions of the Lake County Defendants only after this case was filed demonstrate a clear likelihood that the Lake County Defendants' unconstitutional conduct will recur—indeed, it has not ceased with respect to a substantial number of books, including its affirmative and unexplained restriction on classroom instruction of *Tango*.

82.    Restricting access to *Tango* in public school libraries was not a legitimate regulation of curriculum because school libraries are not classrooms where a prescribed curriculum must be followed. Books in school libraries are, by nature, optional reading. Even if library shelves constituted curriculum, Lake County had no legitimate pedagogical purpose for barring students' access to *Tango*. *Tango* is age-appropriate for Lake County school students, including those below fourth grade; it contains no obscenity or vulgarity; and it is factually accurate. Lake County's prohibition on allowing kindergarten through third-grade students to access *Tango* in their school libraries violates the First Amendment by discriminating against the Author Plaintiffs on the basis of the content and viewpoint contained in *Tango*.

34

83.    To the extent that § 1001.42(8)(c)(3), and regulations adopted by the State Defendants thereunder, mandate the restriction of *Tango*, § 1001.42(8)(c)(3) and its implementing regulations violate the First Amendment by discriminating against protected speech on the basis of content and viewpoint.

84.    The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own. Schoolchildren are a uniquely important audience for the scientific and historical account *Tango* offers and the message the Authors intend the book to convey.

85.    By censoring *Tango* and barring students below the fourth grade from accessing the book in Lake County public school libraries, Defendants stripped the Authors' book of an essential aspect of its communicative value. They also injured the reputation of the Authors and *Tango* by implicitly and falsely suggesting that the book contains obscene, vulgar, sexual, or age-inappropriate material that deserved to be banned—contrary to the wholesome, positive and family-friendly content of the book[21]—and thereby deprived the Authors of more of their target audience and speech rights.

86.    In the alternative, to the extent that § 1001.42(8)(c)(3) and its

---

[21] *See generally* Ex A.

implementing regulations do not mandate the restriction of *Tango*, the statute and regulations are unconstitutionally vague and overbroad. Section 1001.42(8)(c)(3) applies to "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity." The statute does not define "classroom instruction," "sexual orientation," or "gender identity," and does not limit the universe of "school personnel" or unspecified "third parties" subject to the Ban. *Tango* was a library book and not a part of a classroom curriculum. On information and belief, no classes in Lake County Schools prescribed *Tango* as part of their curriculum. And *Tango* does not provide instruction on sexual orientation or gender identity. It merely provides a factually accurate depiction of two animals of the same sex who formed a pair bond and raised a chick together. The vagueness of the Act caused or allowed Lake County Schools to adopt an overbroad interpretation of the Ban, censor the Authors' book, and thereby infringe the Authors' freedom of expression.

## IV. The Escambia County Defendants Remove *Tango* Without Attempting to Hide Their Animus Toward *Tango*'s Viewpoint

87.    Vicki Baggett is an English teacher at Northview High School in Century, Florida, which is within the Escambia County School District.

88.    Ms. Baggett has been accused by multiple former students of engaging in openly racist and homophobic behavior, including allegations that Ms. Baggett told her tenth-grade English class that the Bible says it is a "sin

for races to mix together" and that she opposed "race mixing" because she "didn't want everyone to turn the same color eventually."[22]

89.    Ms. Baggett has submitted "challenge forms" seeking the removal of at least 116 books from school libraries in Escambia County.

90.    On or about August 24, 2022, Ms. Baggett submitted a challenge form seeking the removal of *Tango* from Escambia County school libraries, stating her reason for objection as "LGBTQ agenda using penguins" and claiming that the purpose of *Tango* was "indoctrination." Ms. Baggett asserted that *Tango* should not be used as educational media for any age group. This challenge form is pictured below:

---

[22] Judd Legum, *Florida English teacher pushing book bans is openly racist and homophobic, students allege*, Popular Information (Jan. 9, 2023), https://popular.info/p/florida-english-teacher-pushing-book [https://perma.cc/2T9M-2X8Y].

**REQUEST FOR THE RECONSIDERATION OF EDUCATIONAL MEDIA**

School: _Northview High School_

Requested Initiated By: _Vicki Baggett_

Telephone: ████████   Address: ████████

City: _Century_   State: _FL_   Zip code: _32535_

**Please Check Media Type**

X Book ___ Film ___ Videocassette

___ Periodical ___ Filmstrip ___ Record   _Set I_

___ Pamphlet ___ Cassette ___ Computer Software   _# 7_

___ Laser Videodisc ___ Kit ___ Other: ___

Title: _And Tango Makes Three_

Author: _Justin Richardson_

Publisher or Producer: ___

1. Reasons for Objections: _LGBTQ agenda using penguins_

2. Have you read, viewed, and/or listened to the entire educational media to which you object? _Yes_

3. What are the strengths of this educational media? _none_

4. Are you aware of the judgment of this educational media by literary and authoritative critics? _Yes_

5. What do you believe is the purpose of this educational media? _indoctrination_

6. For what age group would you recommend this educational media? _none_

7. Where was the educational media located in the school system? _elementary schools_

8. On what date(s) was the material utilized for instruction? _N/A_

Signature of Complainant: _Vicki Baggett_   Date: _8-24-22_

91.     On November 16, 2022, Ms. Baggett submitted a letter in support of her challenge form. Her letter cited H.B. 1557 and recited the text of the Ban:

> Florida's House Bill 1557 states that "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through Grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."

She claimed that "[o]ur libraries are an extension of our classrooms" and that "[t]he library is actually the classroom for the Media Specialist; therefore, if the Media Specialists allow books that openly violate state and federal law, then should not these employees be held accountable for books in their domain, just as regular classroom teachers?" Ms. Baggett capitalized on the fact that the State Defendants' regulations implementing the Act could threaten the livelihood of media specialists if classified as falling within the undefined terms "school personnel" and "third parties."

92.    Ms. Baggett later stated in a December 2022 interview that she objected to *Tango* because if young students read the book, "that idea would pop into the second grader's mind … that these are two people of the same sex that love each other."[23] In other words, her animus was explicitly motivated by the content of the book and the viewpoint it expresses.

93.    The Escambia County District Materials Review Committee—composed of one elementary school media specialist, one administrator, one teacher, and one parent, as well as a community member—undertook a careful review process to evaluate whether *Tango* should be removed from school

---

[23] Judd Legum, *Meet the Florida English teacher trying to ban 150 books from school libraries*, Popular Information (Dec. 20, 2022), https://popular.info/p/meet-the-florida-english-teacher [https://perma.cc/9R9F-VGE8].

district libraries. As part of this process, each Escambia County elementary school's Library Advisory Council—each composed of, at least, the library's media specialist, two teachers, one parent, and one community member—was given an opportunity to provide input on *Tango*. Of the eleven Library Advisory Councils that submitted feedback, eight determined that *Tango* had "literary, artistic, political or scientific value for [its] suggested audience" and that it presented "concepts in a manner appropriate to the ability and maturity level of the suggested audience."[24]

94.     The eight local Library Advisory Councils finding that *Tango* had educational value—including the Library Advisory Council at Warrington Elementary School, which B.G. attends—offered well-reasoned explanations of their conclusion, such as that "[t]he book provides the process of how penguins take care of their eggs" and that *Tango* "shows how animals behave and it is based on a true story." By contrast, none of the three Library Advisory Councils that found that *Tango* lacked educational value was able to offer *any* explanation for that finding, all leaving that question blank on the input forms they submitted.

---

[24] Ex. D, *Board Appeal, And Tango Makes Three* 41–62, Sch. Bd. of Escambia Cty. (Feb. 20, 2023).

95.     The same three Library Advisory Councils that found that *Tango* was inappropriate for the ability and maturity level of elementary school students gave threadbare and/or pretextual justifications, if any, for these conclusions. Ensley Elementary and West Pensacola Elementary's Library Advisory Councils offered no explanation at all for their findings on this factor. Beulah Elementary's Library Advisory Council asserted the book was age-inappropriate because "[v]ery young students may not understand the word 'male'" and that "if [young students] do [understand the word 'male'] they may be confused as to why 2 male penguins are sitting on an egg." These explanations beggar belief, but even if they are true, then they are reasons to offer *Tango* as reading material, not to ban it. Children who do not know the word "male" should learn it, and children who are confused about real-world animal behavior likewise deserve the opportunity to explore the topic. And any purported concern that children would be confused as to why two male penguins are sitting on an egg reflects outright viewpoint discrimination: The Library Advisory Council at issue simply disliked and sought to discriminate against the viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

96.     During the review process, both community members and school library personnel noted the direct relevance of *Tango* to the family structures

41

of elementary school students in Escambia County schools. A.K. Suter Elementary School's Library Advisory Council reported that "[w]e have students with two moms. It is important they see themselves and family situations in books" and that *Tango* would make "[s]tudents with two same-sex parents ... feel represented." Blue Angels Elementary School's Library Advisory Council noted, "In nature there are same sex relationships and there are children in our schools who have parents in a same sex relationship—two dads or two moms. The children need read [*sic*] a book that shows their family." A comment from a community member stated that "we ... need to be cogni[zant] of the fact that some of our students, whose parents are taxpayers, come from same-sex families and books with no sexual content should not be excluded from the library simply because someone feels that same-sex families are repulsive. Books in school libraries should mirror the population it serves."[25]

97.    After soliciting and assessing this feedback from the Library Advisory Councils and community members, examining the text of H.B. 1557, and conducting its own intensive review of *Tango*,[26] the District Materials Review Committee voted unanimously that *Tango* should be available in all Escambia County elementary, middle, and high school libraries. The Committee firmly

---

[25] *Id.* at 63.

[26] *See generally id.*

concluded that there was "NO evidence of LGBTQ indoctrination" in *Tango*, nor any inappropriate sexual content in the story. Furthermore, the Committee found that *Tango* had educational value for elementary school students, in the form of "[s]cientific facts about penguins" and teaching "[t]olerance of differences of others."[27]

98.    The District Materials Review Committee decided that the book was age-appropriate. Nothing about it was sexual; it used simple words; it was not "lengthy or preachy." Neither did it "push for an agenda" or "say one thing is better than another." "The act of being 'in love' itself is not, in [the Committee's] opinion, harmful to the well being of minors."[28]

99.    Ms. Baggett appealed. In her appeal letter, she invoked H.B. 1557 as the applicable prohibition. The materials distributed to the school board deciding the appeal included a copy of H.B. 1557, which was expressly described as a "Relevant Florida State Statute[.]"[29]

100.    In preparation for the school board meeting where it would consider Ms. Baggett's appeal, the Escambia County Board solicited input from its community. The Board received seven written comments. Every comment

---

[27] *Id.* at 8–12.

[28] *Id.*

[29] *Id.* at 1–2.

supported keeping *Tango* on shelves. The evidence before the Board was overwhelming. The community's opinion was clear.

101. Nevertheless, on February 20, 2023, the Escambia County School Board voted, three to two, to remove *Tango* from all 32 school libraries in the district. All three books on the agenda that night featured non-heterosexual or transgender main characters.

102. At the school board meeting, those speakers who supported *Tango*'s removal explicitly expressed animus towards the book's point of view.

103. One speaker, Joshua Luther, accused the Authors of "telling the story … to normalize a redefinition of the institution of marriage." He later asked the Escambia County Board point-blank whether its members believed sodomy was a sin. Mr. Luther's point could not have been clearer. *Tango* was gay-friendly, and therefore it needed to be removed from the library.

104. There was nothing else objectionable about *Tango*. And in fact, no speaker that night condemned *Tango* on any other grounds.

105. But when faced with hostility towards *Tango*'s message, the Escambia County Board joined in the discriminatory condemnation of the Authors' viewpoint. Board member David Williams voted to remove *Tango* because "[t]he fascination is still on that it's two male penguins raising a chick."[30]

---

[30] Brooke Leigh Howard, *Florida School District Bans a Book on… Penguins*,

Board members Kevin Adams and Paul Fetsko agreed, and, with a majority, the Escambia County Board chose to censor the Authors' speech, enforcing § 1001.42(8)(c)(3) by removing *Tango* and the message it contains.

106.   In applying § 1001.42(8)(c)(3) to remove *Tango* from school libraries, the Escambia County Defendants discriminated on the basis of content and viewpoint: They removed *Tango* because of its content—namely, the story of a same-sex animal couple—and its expressed viewpoint—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

107.   Removing *Tango* from school libraries was not a legitimate regulation of curriculum because school libraries are not classrooms where a prescribed curriculum must be followed. Books in school libraries are, by nature, optional reading. Even if library shelves constituted curriculum, Escambia County Schools had no legitimate pedagogical purpose for removing *Tango*. *Tango* is age-appropriate for Escambia County students; contains no obscenity or vulgarity; and is factually accurate. Escambia County's removal of *Tango*

---

Daily Beast (Feb. 22, 2023), https://www.thedailybeast.com/and-tango-makes-three-florida-school-district-bans-a-book-on-penguins [https://perma.cc/DS45-FUHU].

from library shelves violated the First Amendment by discriminating against the Author Plaintiffs on the basis of content and viewpoint.

108.  To the extent that § 1001.42(8)(c)(3), and regulations adopted by the State Defendants thereunder, mandated the removal of *Tango*, § 1001.42(8)(c)(3) and its implementing regulations violate the First Amendment by discriminating against protected speech on the basis of content and viewpoint.

109.  The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior and family structures, whether similar to or different from their own. Schoolchildren are a uniquely important audience for the historical account *Tango* offers and the message the Authors intend the book to convey.

110.  By censoring *Tango* and prohibiting the book from Escambia County school libraries, Defendants have stripped the Authors' book of an essential aspect of its communicative value. They have also injured the reputation of the Authors and *Tango* by implicitly and falsely suggesting that the book contains obscene, vulgar, sexual, or age-inappropriate material—contrary to the facial content of the book, *see* Ex. A—and have thereby deprived the Authors of more of their target audience and speech rights.

111.  The removal of *Tango* has likewise infringed B.G.'s right to receive information. Students' access to books like *Tango* both preserves the right of

46

*Tango*'s authors to speak and is essential to students' active and effective participation in a pluralistic, contentious society. B.G. desires to read *Tango* to explore areas of interest and importance not covered in the prescribed curriculum. By removing *Tango* from school libraries for narrowly partisan, political reasons, the Escambia County Defendants have prohibited her from doing so. B.G. has attempted to check *Tango* out of her school library and has been unable to do so because the book is no longer available there.

112.   In the alternative, to the extent that § 1001.42(8)(c)(3) and its implementing regulations do not mandate the removal of *Tango*, the statute and regulations are unconstitutionally vague and overbroad. Section 1001.42(8)(c)(3) applies to "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity." The statute does not define "classroom instruction," "sexual orientation," or "gender identity," and does not limit the universe of "school personnel" or unspecified "third parties" subject to the Ban. *Tango* was a library book and not a part of a classroom curriculum. On information and belief, no classes in Escambia County Schools prescribed *Tango* as part of their curriculum. And *Tango* does not provide instruction on sexual orientation or gender identity. It merely provides a factually accurate depiction of two animals of the same sex who formed a pair bond and raised a chick together. Escambia County Schools' removal of *Tango* from libraries therefore was not mandated by § 1001.42(8)(c)(3), but the vagueness

47

of the statute caused or allowed Escambia County Schools to adopt an over-
broad interpretation of the Ban, censor the Authors' book, and thereby infringe
the Authors' freedom of expression and B.G.'s right to receive information.

## CAUSES OF ACTION

### COUNT I
**First Amendment to the United States Constitution:
Content and Viewpoint Discrimination
Under Fla. Stat. § 1001.42(8)(c)(3)
(Brought pursuant to 42 U.S.C. § 1983 by the Author Plaintiffs)**

113.   Plaintiffs incorporate paragraphs 1–19, 26–85, and 87–110 by ref-
erence as though fully set forth herein.

114.   The First Amendment to the United States Constitution provides
that the government "shall make no law … abridging the freedom of speech."
U.S. Const. amend. I. The First Amendment is made applicable to the State of
Florida by the Due Process Clause of the Fourteenth Amendment. *See
Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936).

115.   "Government regulation of speech is content based if a law applies
to particular speech because of the topic discussed or the idea or message ex-
pressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based
regulation is unconstitutional unless the government "prove[s] that the re-
striction furthers a compelling interest and is narrowly tailored to achieve that
interest." *Id.* "Viewpoint discrimination is … an egregious form of content dis-
crimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819,

829 (1995). It is "presumed to be unconstitutional," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

116.   *And Tango Makes Three* is protected speech by the Author Plaintiffs. The School Defendants previously purchased, provided, and permitted access to the book in public school libraries. The School Defendants removed the book from public school libraries or restricted access to the book within public school libraries based on the topic discussed, idea or message expressed, and opinion of the Author Plaintiffs—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children. The School Defendants removed or restricted *Tango* based on the threat of the State Defendants' enforcement of provisions of the Act that punish speech based on the topic discussed, idea or message expressed, and opinion of the speaker. The School Defendants' action had no legitimate pedagogical purpose.

117.   Fla. Stat. § 1001.42(8)(c)(3) is unconstitutional as applied to the Author Plaintiffs by Defendants. Neither the statute nor its application here furthers a compelling interest or is narrowly tailored to achieving that interest.

118.   The enforcement of § 1001.42(8)(c)(3) and the restriction of access to *Tango* are actions under color of state law that have deprived the Author

Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

119.   As a direct and proximate result of Defendants' unlawful conduct, the Author Plaintiffs have been and will be injured in their ability to express themselves, in violation of the First Amendment. This injury is continuing and irreparable. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

120.   The Author Plaintiffs are entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction immediately, and throughout the pendency of this action.

121.   The Author Plaintiffs are entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutional and therefore void to the extent that it requires the removal or restriction of any books—such as *Tango*—in school libraries. The Author Plaintiffs are further entitled to a declaratory judgment that Defendants' actions violated the Author Plaintiffs' rights under the Constitution and laws of the United States.

122.   The Author Plaintiffs are entitled to a permanent injunction requiring the Escambia County Defendants to restore *Tango* to library shelves where it has been removed and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in public school libraries.

50

123.   The Author Plaintiffs are entitled to nominal damages.

## COUNT II
### First Amendment to the United States Constitution:
### Violation of Right to Receive Information
### Under Fla. Stat. § 1001.42(8)(c)(3)
### (Brought pursuant to 42 U.S.C. § 1983 Against the State Defendants
### and the Escambia County Defendants by B.G.)

124.   Plaintiffs incorporate paragraphs 1–16, 20–27, 30–66, and 87–111 by reference as though fully set forth herein.

125.   The First Amendment to the United States Constitution "protects the right to receive information and ideas," and this right is violated by "the removal of books from the shelves of a school library" for the purpose of "deny[ing] … access to ideas with which [the government] disagree[s]." *Pico*, 457 U.S. at 866–67, 871. This right is incorporated to the States by the Due Process Clause of the Fourteenth Amendment. *See Grosjean*, 297 U.S. at 243.

126.   By restricting access to *Tango* for narrowly partisan, political reasons, Defendants have violated B.G.'s right to receive information.

127.   B.G. desires to read *Tango* and would read *Tango* if it were available in her school library. She asked her father to help her check out *Tango* at her elementary school. She and her father have been unable to do so because the book is no longer available in B.G.'s school library.

128.   *Tango* previously was available in B.G.'s school library but was removed by the Escambia County Defendants pursuant to § 1001.42(8)(c)(3) for

narrowly partisan, political reasons. The book was removed because of the content it contains—namely, the depiction of two same-sex penguins and their adoption of a penguin chick—and the viewpoint it expresses—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

129.   As a direct and proximate result of Defendants' unlawful conduct, B.G. has been injured in her right to receive information and ideas. This injury is continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

130.   Fla. Stat. § 1001.42(8)(c)(3) is unconstitutional as applied to the B.G. by Defendants. The removal of *Tango* occurred for narrowly partisan, political reasons that were unrelated to legitimate pedagogical concerns and served no other legitimate state purpose. Instead, the removal of access to *Tango* was rooted in animus against the viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children, as demonstrated by the public record.

131.   The enforcement of § 1001.42(8)(c)(3) and the restriction of access to *Tango* were actions under color of state law that have deprived B.G. of rights, privileges, or immunities secured by the Constitution and laws of the United States.

132.   B.G. is entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction immediately, and throughout the pendency of this action.

133.   B.G. is entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutional and therefore void to the extent it requires the removal or restriction of any books—such as *Tango*—in school libraries. B.G. is further entitled to a declaratory judgment that the Escambia County and State Defendants' actions violated her rights under the Constitution and laws of the United States.

134.   B.G. is entitled to a permanent injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in school libraries.

135.   B.G. is entitled to nominal damages.

## <u>COUNT III</u>
### Fourteenth Amendment to the United States Constitution: Vagueness of Fla. Stat. § 1001.42(8)(c)(3) (Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs)

136.   Plaintiffs incorporate paragraphs 1–112 by reference as though fully set forth herein.

137.   Plaintiffs bring this claim in the alternative to Counts I and II.

138.   A statute is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The requirement of clear definitions is of heightened importance where, as here, First Amendment rights are implicated. *See Smith v. Goguen*, 415 U.S. 566, 573 (1974).

139.   Fla. Stat. § 1001.42(8)(c)(3) is unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment because it is void for vagueness.

140.   Section 1001.42(8)(c)(3) prohibits "[c]lassroom instruction" by "school personnel" or "third parties" on "sexual orientation" and "gender identity" in prekindergarten through eighth grade—as well as in any other context where it is not "age-appropriate" or "developmentally appropriate." Each of these terms is vague and undefined. The law is unconstitutionally vague because (1) it fails to provide a person of ordinary intelligence with fair notice of what is prohibited, and (2) its lack of explicit standards authorizes and encourages arbitrary and discriminatory enforcement.

141.   The School Defendants applied § 1001.42(8)(c)(3) either beyond its scope or without an understanding of whether their actions were required by the statute because the statute's terminology failed to clarify whether the presence in a public school library of a factually accurate, non-vulgar, non-obscene book that depicts a same-sex relationship among penguins violates the Ban.

54

The vagueness of the statute and the threat of enforcement by the State Defendants had a chilling effect by causing the School Defendants to ban *Tango* or permitting them to do so through arbitrary and discriminatory enforcement. The School Defendants thereby censored the Author Plaintiffs' book and transgressed the Author Plaintiffs' right to freedom of expression and B.G.'s right to receive information.

142.   The enforcement of § 1001.42(8)(c)(3) and the restriction of access to *Tango* were actions under color of state law that deprived Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

143.   As a direct and proximate result of Defendants' unlawful actions, the Author Plaintiffs have been and will be injured in their right to speak and B.G. has been and will be injured in her right to receive information. These injuries are continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

144.   Plaintiffs are entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdictions immediately, and throughout the pendency of this action.

145. Plaintiffs are entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutionally vague and therefore void to the extent that it fails to clearly state whether it requires the removal or restriction of any books—such as *Tango*—in public school libraries. They are further entitled

to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutional and there-fore void to the extent they require or may be read to require the removal or restriction of any books—such as *Tango*—in public school libraries. Plaintiffs are further entitled to a declaratory judgment that Defendants' actions vio-lated Plaintiffs' rights under the Constitution and laws of the United States.

146.   Plaintiffs are entitled to a permanent injunction requiring the Es-cambia County Defendants to restore *Tango* to library shelves where it has been removed and to restore students' unrestricted student access to *Tango* in their jurisdictions and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in public school libraries.

147.   Plaintiffs are entitled to nominal damages.

## COUNT IV
**First Amendment to the United States Constitution: Overbreadth of
Fla. Stat. § 1001.42(8)(c)(3)
(Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs)**

148.   Plaintiffs incorporate paragraphs 1–112 by reference as though fully set forth herein.

149.   Plaintiffs bring this claim in the alternative to Counts I, II, and III.

150.   A statute "may be invalidated as overbroad if 'a substantial num-ber of its applications are unconstitutional, judged in relation to the statute's

plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

151.   To the extent that § 1001.42(8)(c)(3) has any plainly legitimate sweep, it is unconstitutionally overbroad because it punishes a substantial and disproportionate amount of protected free speech in relation to its purportedly legitimate sweep.

152.   Even to the extent that any applications of § 1001.42(8)(c)(3) could be interpreted to have a legitimate pedagogical purpose, the statute is not narrowly tailored to that purpose but rather has and will be applied in a manner that infringes authors' right to freedom of expression and students' right to receive information, as it was applied here.

153.   Section 1001.42(8)(c)(3)'s overbroad restrictions are not justified by preventing disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purpose. Instead, the law is expressly discriminatory against protected speech on the basis of the content and viewpoint of that speech.

154.   The enforcement of § 1001.42(8)(c)(3) and removal and restriction of access to *Tango* are actions under color of state law that have deprived Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

155.   As a direct and proximate result of Defendants' unlawful actions, the Author Plaintiffs have been and will be injured in their right to speak, and B.G. has been and will be injured in her right to receive information. These injuries are continuing and irreparable. *See, e.g.*, *Elrod*, 427 U.S. at 373.

156.   Plaintiffs are entitled to a preliminary injunction requiring the Escambia County Defendants to restore unrestricted student access to *Tango* in their jurisdiction immediately, and throughout the pendency of this action.

157.   Plaintiffs are entitled to a declaratory judgment that § 1001.42(8)(c)(3) is unconstitutionally overbroad and therefore unenforceable. They are further entitled to a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States.

158.   Plaintiffs are entitled to a permanent injunction requiring the Escambia County Defendants to restore *Tango* to library shelves where it has been removed and to restore unrestricted student access to *Tango* in their jurisdictions and prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of any books—such as *Tango*—in public school libraries.

159.   Plaintiffs are entitled to nominal damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

*First*, a preliminary injunction requiring the Escambia County

Defendants to restore *Tango* to Escambia County public school libraries from which it has been removed;

*Second*, a permanent injunction requiring the Escambia County Defendants to restore students' ability to access *Tango* in Escambia County public school libraries;

*Third*, a declaratory judgment that § 1001.42(8)(c)(3) is (a) unconstitutional and therefore unenforceable to the extent that it requires or may be read to require the removal or restriction of any materials in public school libraries, or (b) unconstitutionally vague and/or overbroad and therefore unenforceable;

*Fourth*, a declaratory judgment that Defendants' actions violated Plaintiffs' rights under the Constitution and laws of the United States;

*Fifth*, a permanent injunction prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) to require the removal or restriction of materials in public school libraries, or in the alternative, a permanent injunction prohibiting the State Defendants from enforcing § 1001.42(8)(c)(3) in any manner;

*Sixth*, nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights;

*Seventh*, an award of reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

*Eighth*, such other relief as the Court deems necessary and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated:  New York, NY
           August 25, 2023

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By:   /s/      *Faith E. Gay*
        Faith E. Gay (FBN 129593)
        Lauren J. Zimmerman*
        Max H. Siegel*
        Masha Simonova**
        Nancy A. Fairbank*
        SELENDY GAY ELSBERG PLLC
        1290 Avenue of the Americas
        New York, NY 10104
        Tel: 212-390-9000
        fgay@selendygay.com
        lzimmerman@selendygay.com
        msiegel@selendygay.com
        msimonova@selendygay.com
        nfairbank@selendygay.com

        Anna T. Neill (FBN 100945)
        William J. Blechman (FBN 379281)
        KENNY NACHWALTER, P.A.
        1441 Brickell Avenue, Suite 1100
        Miami, FL 33131
        Tel: 305-373-1000
        atn@knpa.com
        wjb@knpa.com

        *Counsel for Plaintiffs*

        *(admitted *pro hac vice*)

        **(application for admission *pro hac vice* pending)