UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Peter Parnell, *et al.*,

                Plaintiffs,

        v.

School Board of Escambia County,
Florida, *et al.*,

                Defendants.

Case No. 23-cv-381 (BJD) (PRL)

**PRELIMINARY INJUNCTIVE
RELIEF REQUESTED**

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Date:  August 29, 2023

Anna T. Neill
William J. Blechman
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
atn@knpa.com
wjb@knpa.com

Faith E. Gay
Lauren J. Zimmerman*
Max H. Siegel*
Masha Simonova**
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
fgay@selendygay.com
lzimmerman@selendygay.com
msiegel@selendygay.com
msimonova@selendygay.com

*Counsel for Plaintiffs*

*(admitted *pro hac vice*)

**(application for admission *pro hac
vice* pending)

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ........................................................................................... 3

    A.    The Author Plaintiffs Write *And Tango Makes Three* .............. 3

    B.    The State Enacts Fla. Stat. § 1001.42(8)(c)(3), Rooted in Discriminatory Animus ........................................................... 4

    C.    The Escambia County Defendants Remove *Tango* from Public School Libraries Based Solely on the Book's Viewpoint ................................................................................ 6

LEGAL STANDARD ................................................................................. 10

ARGUMENT .............................................................................................. 10

I.    Plaintiffs Are Likely to Succeed on the Merits ................................. 10

    A.    The Author Plaintiffs Are Likely to Succeed on the Merits of Their Viewpoint Discrimination Claim ............................. 10

    B.    The Student Plaintiff Is Likely to Show That the Removal of *Tango* Violates Her Right to Receive Information ............. 15

II.    Plaintiffs Face Continuing Irreparable Harm from the Ongoing and Impending Injury to Their First Amendment Rights ................. 21

III.    An Injunction Ending an Unconstitutional Deprivation of Rights Would Be Equitable and in the Public Interest ..................... 22

CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ........................................ 11, 16, 17, 19

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit
Auth.*,
901 F.3d 356 (D.C. Cir. 2018) ............................................. 12

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ............................................. 19

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ........................................................ 11

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) ........................................... 11

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v.
Pico*,
457 U.S. 853 (1982) ................................................. *passim*

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) ........................................................ 16

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................ 14

*Campbell v. St. Tammany Par. Sch. Bd.*,
64 F.3d 184 (5th Cir. 1995) ............................................... 15

*Complete Angler, LLC v. City of Clearwater*,
607 F. Supp. 2d 1326 (M.D. Fla. 2009) ................................ 23, 24

*Democratic Exec. Comm. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ........................................... 23

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................ 21

*Erznoznik v. City of Jacksonville,*
   422 U.S. 205 (1975) ............................................................ 14

*FF Cosmetics FL, Inc. v. City of Miami Beach,*
   866 F.3d 1290 (11th Cir. 2017) ................................... 10, 21

*First Nat'l Bank of Bos. v. Belotti,*
   435 U.S. 765 (1978) ............................................................ 23

*Frederick Douglass Found., Inc. v. District of Columbia,*
   531 F. Supp. 3d 316 (D.D.C. 2021) ................................... 12

*Grosjean v. Am. Press Co.,*
   297 U.S. 233 (1936) ............................................................ 10

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) .................................... 16, 18, 19, 20

*Joelner v. Village of Washington Park,*
   378 F.3d 613 (7th Cir. 2004) ............................................ 23

*KH Outdoor, LLC v. City of Trussville,*
   458 F.3d 1261 (11th Cir. 2006) ................................... 21, 23

*LaCroix v. Town of Fort Myers Beach,*
   38 F.4th 941 (11th Cir. 2022) ..................................... 22, 23

*Members of the City Council v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ............................................................ 12

*Otto v. City of Boca Raton,*
   981 F.3d 854 (11th Cir. 2020) ................................... *passim*

*Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.,*
   426 F.3d 617 (2d Cir. 2005) ............................................ 19

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.,*
   2022 WL 16985720 (N.D. Fla. Nov. 17, 2022) ................ 16

*R.A.V. v. City of St. Paul,*
 505 U.S. 377 (1992) ................................................................ 14

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ................................................................ 14

*Right to Read Def. Comm. v. Sch. Comm.,*
 454 F. Supp. 703 (D. Mass. 1978) .................................... 16

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
 141 S. Ct. 63 (2020) ......................................................... 21, 22

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
 515 U.S. 819 (1995) ......................................................... 10, 11

*Scott v. Roberts,*
 612 F.3d 1279 (11th Cir. 2010) ......................................... 23

*Searcey v. Harris,*
 888 F.2d 1314 (11th Cir. 1989) ......................................... 19

*Siegel v. LePore,*
 234 F.3d 1163 (11th Cir. 2000) ......................................... 10

*Speech First, Inc. v. Cartwright,*
 32 F.4th 1110 (11th Cir. 2022) ............................... 21, 22, 23

*Stanley v. Georgia,*
 394 U.S. 557 (1969) ............................................................. 15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
 393 U.S. 503 (1969) ............................................................. 15

*Virgil v. Sch. Bd.,*
 862 F.2d 1517 (11th Cir. 1989) ......................... 16, 18, 19, 20

*W. Va. Bd. of Educ. v. Barnette,*
 319 U.S. 624 (1943) ............................................................. 15

*Zukerman v. U.S. Postal Serv.,*
 567 F. Supp. 3d 161 (D.D.C. 2021) ............................... 12, 13

**Statutes**

2023 Florida House Bill 1069............................................................ 4, 5

Fla. Stat. § 1001.42(8)(c)(3) ...................................................... *passim*

Fla. Stat. §§ 1006.28(2), 1001.42(8)(c)(3) ....................................... 1

**Rules**

Fed. R. Civ. P. 65(a)................................................................. 1, 25

Local Rule 6.02 ....................................................................... 1, 25

**Constitutional Provisions**

U.S. Const. amend. I ................................................................ *passim*

## PRELIMINARY STATEMENT

Injury to First Amendment rights is irreparable. For that reason, Plaintiffs Justin Richardson and Peter Parnell (together, the "Authors" or "Author Plaintiffs") and Plaintiff B.G. (the "Student Plaintiff" and, together with the Author Plaintiffs, the "Plaintiffs") respectfully seek a preliminary injunction, pursuant to Fed. R. Civ. P. 65(a) and Local Rule 6.02, requiring Defendants School Board of Escambia County, Florida (the "Escambia County Board") and Keith Leonard (together, the "Escambia County Defendants") to restore students' ability to access *And Tango Makes Three* ("*Tango*"), regardless of grade level, in Escambia County public school libraries immediately and through the pendency of this action.[1]

The Author Plaintiffs wrote *Tango* to share with children a heartwarming true story about animals in the Central Park Zoo. *See* Richardson Decl. ¶¶ 5, 11; Parnell Decl. ¶¶ 5, 11. The book espouses a message of tolerance along with traditional family values of love, nurture, and parental responsibility. It has been lauded by numerous literary and educational groups, Richardson Decl. ¶ 12; Parnell Decl. ¶ 12, and has been read and adored by thousands of children—including, for years, in Escambia County, Florida.

But in or before February 2023, the Escambia County Defendants decided to physically remove *Tango* from school library shelves, repeatedly invoking Florida's 2022 House Bill 1557, codified at Fla. Stat. §§ 1006.28(2), 1001.42(8)(c)(3).

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the First Amended Complaint, ECF No. 61.

Gay Decl., Ex. B, at 6. Section 1001.42(8)(c)(3) prohibits classroom instruction on gender identity or sexual orientation. Fla. Stat. § 1001.42(8)(c)(3). The legislative record makes clear that the law is targeted at LGBTQ+ identity and designed to suppress any message of tolerance for LGBTQ+ individuals. This discriminatory animus underlies the Escambia County Defendants' removal. Giving no justification but H.B. 1557 and animus toward the book's message of tolerance for LGBTQ+ individuals, the Escambia County Defendants pulled *Tango* from school library shelves against the recommendations of local elementary school educators and community members, who found the book educational and highly appropriate for a school environment. Gay Decl., Ex. C, at 8–13.

This removal is a First Amendment violation of the highest magnitude. It strips the Authors of their right to speak to their audience based solely on the viewpoint of their speech. It strips the Student Plaintiff of her right to access the information and ideas in *Tango* based solely on the book's viewpoint, for no legitimate pedagogical reason. Because *Tango* is a factually accurate, nonvulgar, non-obscene, age-appropriate work, *see* Richardson Decl. ¶ 9–11; Parnell Decl. ¶ 9–11; Gay Decl., Ex. A, there is no legitimate reason for the removal of the book. Thus, Plaintiffs are likely to succeed on the merits.

The First Amendment injury to the Plaintiffs is ongoing and impending, and it is irreparable under well-settled constitutional principles and on the facts that, since February 2023, (1) the Authors have been and continue to be unable to speak to their target audience, and (2) the Student Plaintiff has been and will be unable

to access information and ideas contained in *Tango*. By contrast, the Escambia County Defendants have no legitimate interest in continuing their unconstitutional removal or enforcing an unconstitutional statute. The public interest plainly favors the protection of constitutional rights.

This Court should grant a preliminary injunction requiring the Escambia County Defendants to immediately restore *Tango* to the shelves in Escambia County public school libraries and to maintain students' access to the book throughout the pendency of this action.

## BACKGROUND

### A.     The Author Plaintiffs Write *And Tango Makes Three*

In 2005, Plaintiffs Justin Richardson and Peter Parnell authored *And Tango Makes Three*, a children's book that tells the true story of two penguins in New York City's Central Park Zoo. Richardson Decl. ¶¶ 5, 9; Parnell Decl. ¶¶ 5, 9. The two male penguins, named Roy and Silo, formed an enduring pair bond and, with the help of a conscientious zookeeper, adopted, hatched, and raised a chick named Tango. Richardson Decl. ¶¶ 6–7; Parnell Decl. ¶¶ 6–7. The book is intended to teach children about animal behavior and to share a message of tolerance for varied family structures. *See* Richardson Decl. ¶¶ 11, 14–15; Parnell Decl. ¶¶ 11, 14–15. The Authors wrote *Tango* for children, and its publisher recommends it for young children (although the book is appropriate for all ages). *See* Richardson Decl. ¶¶ 5, 9; Parnell Decl. ¶¶ 5, 9. *Tango* has clear pedagogical worth: It tells a true and heartwarming story, and teaches students about animal behavior, adoption,

diversity among family structures, and responsible family values. *See* Richardson Decl. ¶¶ 11, 14–15; Parnell Decl. ¶¶ 11, 14–15. It has been showered with accolades from literary and educational groups because of its value to children. *See* Richardson Decl. ¶ 12; Parnell Decl. ¶ 12. The book is factually accurate and contains no vulgarity, obscenity, or explicit content that may not befit a school environment or be appropriate for children. Richardson Decl. ¶ 9–11; Parnell Decl. ¶ 9–11; *see also* Gay Decl., Ex. A. *Tango*'s poignant story and colorful illustrations are innocent and heartwarming. The book is in many public school libraries throughout the country and was in public school libraries in Escambia County, Florida prior to February 2023. But *Tango*'s depiction of a same-sex partnership between Roy and Silo, despite being objectively true, has provoked challenges to the book's inclusion in Florida school libraries.[2]

## B. The State Enacts Fla. Stat. § 1001.42(8)(c)(3), Rooted in Discriminatory Animus

In 2022, Florida passed House Bill 1557 (commonly known as the "Don't Say Gay" Law), a vague, overbroad, discriminatory statute prohibiting "[c]lassroom instruction … on sexual orientation or gender identity … in kindergarten through grade 3" (the "Ban") (codified at Fla. Stat. § 1001.42(8)(c)(3)). Florida has since passed 2023 House Bill 1069, which expands the Ban to cover prekindergarten

---

[2] *See, e.g.*, Judd Legum, *Florida English teacher pushing book bans is openly racist and homophobic, students allege*, Popular Information (Jan. 9, 2023), https://popular.info/p/florida-english-teacher-pushing-book [https://perma.cc/2T9M-2X8Y] (reporting that *Tango*'s inclusion in Escambia County, Florida school libraries was challenged on the basis that the book promotes the "LGBTQ agenda").

through eighth grade. H.B. 1069 was signed into law on May 17, 2023 and became effective on July 1, 2023.

The Ban's discriminatory anti-LGBTQ+ intent became clear during the legislative process. Lawmakers rejected amendments that would have made the law viewpoint-neutral. By way of example, during deliberations on H.B. 1557, Senator Tina Polsky proposed an amendment to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality." That amendment was voted down.[3] An amendment proposed by Republican Senator Jeff Brandes would have replaced "sexual orientation or gender identity" with "human sexuality or sexual activity." It too was voted down, despite Senator Brandes imploring his colleagues that "[i]f the intent [of H.B. 1557] is not to marginalize anyone, let's make sure we aren't."[4]

The State thus proceeded with a Ban that uses the terms "sexual orientation" or "gender identity" without defining them (much less defining them to include all sexual orientations).[5] H.B. 1069 did not clarify these terms when expanding the Ban to additional grade levels. Because of its imprecision, the Ban permits—and

---

[3] Fla. S., recording of proceedings, at 04:50:30–04:55:00 (Mar. 7, 2022), http://bit.ly/442voD3.

[4] Fla. S. Comm. on Appropriations, recording of proceedings, at 01:04:00–01:07:00 (Feb. 28, 2022), http://bit.ly/43ZHfBq.

[5] Other amendments intended to clarify the scope and effect of the Ban were similarly voted down. *See* Fla. S., *supra* note 3, at 05:23:30–05:33:30; *id.* at 05:33:30–05:37:00; Fla. H.R., recording of proceedings, at 03:47:30–03:54:00 (Feb. 22, 2022), http://bit.ly/3Jm97rw.

indeed, invites—invidious discrimination against a particular disfavored viewpoint: accepting and supporting LGBTQ+ individuals.

### C. The Escambia County Defendants Remove *Tango* from Public School Libraries Based Solely on the Book's Viewpoint

Through its vagueness, Fla. Stat. § 1001.42(8)(c)(3) allows school districts to discriminatorily enforce the Ban to target only the disfavored viewpoint of acceptance of LGBTQ+ individuals. And that is exactly what the Escambia County Defendants have done.

Vicki Baggett—an English teacher employed within the Escambia County School District—submitted a form challenging *Tango*'s presence in Escambia County public school libraries on or about August 24, 2022. *See* Gay Decl., Ex. C, at 14. Ms. Baggett's challenge form stated her reason for objecting to *Tango* as "LGBTQ agenda using penguins." *See id.* Ms. Baggett subsequently capitalized on the vagueness of the term "classroom instruction" in H.B. 1557, implying that *Tango* should be removed from school libraries pursuant to that provision because "[o]ur libraries are an extension of our classrooms" and that "[t]he library is actually the classroom for the Media Specialist." *Id.* at 16.

Subsequently, the Escambia County District Materials Review Committee—composed of one elementary school media specialist, one elementary school administrator, one elementary school teacher, one parent, and one community member, *see id.* at 8—undertook a careful review process to evaluate whether *Tango* should be removed from school district libraries. *See id.* at 8–13. As part of this

process, each Escambia County elementary school's Library Advisory Council—each composed of, at least, the library's media specialist, two teachers, one parent, and one community member, *see id*. at 41—was given an opportunity to provide input on *Tango*. *See id*. at 41–62. Of the eleven Library Advisory Councils that submitted feedback, eight determined that *Tango* had educational value and was appropriate for the maturity level of its suggested audience. *See id*. They explained that the book "shows how animals behave and is based on a true story" and "provides the process of how penguins take care of their eggs." *Id*. at 61, 45. These Councils also noted that the book would make "[s]tudents with two same-sex parents ... feel represented" and that "there are children in our schools who have parents in a same sex relationship [and] need read [*sic*] a book that shows their family." *Id*. at 56, 61. The three local Library Advisory Councils who did not find that *Tango* had educational value, by contrast, offered no explanation for that finding. Two of the same three Councils provided no justification at all for their conclusion that *Tango* was not appropriate for the ability and maturity level of elementary school students; the third provided only a threadbare and/or pretextual justification, asserting the book was age-inappropriate because "[v]ery young students may not understand the word 'male'" and that "if [young students] do [understand the word 'male'] they may be confused as to why 2 male penguins are sitting on an egg." *Id*. at 43.

After reviewing this feedback from the Library Advisory Councils and community members, examining the text of H.B. 1557, and conducting its own

intensive review of *Tango*, the District Materials Review Committee firmly concluded that *Tango* was age-appropriate and educationally valuable, and voted unanimously that *Tango* should be available in all Escambia County school libraries. *See id.* at 8. It concluded that there was "NO evidence of LGBTQ indoctrination" in the book and that the book did not "push for an agenda." *Id.* at 8–12. Instead, the book taught "[s]cientific facts about penguins" and "[t]olerance of differences of others." *Id.* Ms. Baggett appealed the Committee's decision, again invoking H.B. 1557 and attaching the statute to her appeal letter. *Id.* at 2–7.

On February 20, 2023, the Escambia County School Board acted squarely against the recommendations of the District Materials Review Committee and the substantial majority of Escambia County elementary schools' Library Advisory Councils. The Board voted, three to two, to remove *Tango* from all 32 school libraries in the district. Gay Decl., Ex. B, at 6. Board member David Williams voted to remove *Tango* because "[t]he fascination is still on that it's two male penguins raising a chick."[6] Board members Kevin Adams and Paul Fetsko agreed, and, with a majority, the Escambia County Board chose to censor the Authors' speech and enforce H.B. 1557 in a manner that discriminated on the basis of content and viewpoint, removing *Tango* because of its positive depiction of a same-sex animal couple. Gay Decl., Ex. B, at 6.

---

[6] Brooke Leigh Howard, *Florida School District Bans a Book on… Penguins*, Daily Beast (Feb. 22, 2023), https://www.thedailybeast.com/and-tango-makes-three-florida-school-district-bans-a-book-on-penguins [https://perma.cc/DS45-FUHU].

The Authors, who are themselves a same-sex couple, were troubled to learn that *Tango* had been removed from Escambia County school libraries. The Authors have a sincere and strongly held desire to ensure that *Tango* is available to children learning about animal behavior, adoption, and family structures, whether similar to or different from their own. Richardson Decl. ¶ 15; Parnell Decl. ¶ 15. *Tango*'s removal from Escambia County schools is rooted in anti-LGBTQ+ animus and violates the Authors' First Amendment rights because it censors *Tango*'s viewpoint that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children.

B.G. lives in Escambia County and is a third-grade student at Warrington Elementary School, which is in the Escambia County School District and which B.G. attended last year as well. Guillory Decl. ¶¶ 3, 4. B.G. wanted to check out *Tango* from her school library in or around March 2023 and asked her father for assistance in doing so. *Id.* ¶ 11. However, he accurately informed her that she could not do so because the book had been removed from Escambia County school libraries in or around February 2023. *Id.*

B.G.'s desire to read *Tango* has persisted. *Id.* ¶ 12. B.G. would check out and read the book this semester if it was restored to Escambia County school libraries. *Id.* But the enactment of H.B. 1557 and the Escambia County Board's resulting decision to remove access to *Tango* has prevented and will continue to prevent B.G.

from checking out *Tango* from her school library. *See* Guillory Decl. ¶¶ 11, 12; *see also* Gay Decl., Ex. B at 6.

## LEGAL STANDARD

A party is entitled to a preliminary injunction if it shows that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the Plaintiff outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

## ARGUMENT

### I.  Plaintiffs Are Likely to Succeed on the Merits

#### A.  The Author Plaintiffs Are Likely to Succeed on the Merits of Their Viewpoint Discrimination Claim

*Tango* is speech by the Author Plaintiffs. Under the First Amendment, the government "shall make no law … abridging the freedom of speech." U.S. Const. amend. I; *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936) (First Amendment incorporated against states). The Escambia County Defendants' removal of *Tango* is unconstitutional viewpoint discrimination—"an egregious form of content discrimination" that is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). At the very least, it is content discrimination that fails strict scrutiny.

Despite previously allowing the purchase of *Tango*, providing the book in public school libraries, and allowing all students to check it out, the Escambia County Defendants have removed *Tango* because of the topic discussed, idea or message expressed, and opinion of the Author Plaintiffs—namely, that same-sex relationships and families with same-sex parents exist; that they can be happy, healthy, and loving; and that same-sex parents can adopt and raise healthy children. Richardson Decl. ¶ 14; Parnell Decl. ¶ 14. The Escambia County Defendants did so because of animus toward the book's viewpoint, as well as possible state enforcement actions under the Ban, which punishes speech based on the topic discussed, idea or message expressed, and opinion of the speaker. The Escambia County Defendants' "rationale[s] for the [removal]" are each specifically tied to the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

It is a cardinal principle of First Amendment law that, even in a nonpublic forum, "[t]he government's ability to limit speech … is not unlimited." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1202 (11th Cir. 2009). The state cannot "suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998)). Viewpoint discrimination is "impermissible" even in a nonpublic forum, *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1226 (11th Cir. 2017), and is "presumed to be unconstitutional," *Rosenberger*, 515 U.S. at 828; *see also Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (recognizing

that "there is an argument that such [viewpoint-discriminatory] regulations are unconstitutional *per se*; the Supreme Court has said that 'the First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others,'" but not deciding the issue because action failed strict scrutiny (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984))).

The Escambia County Board did not directly explain its reason for removing *Tango* beyond referencing H.B. 1557 and scattering anti-LGBTQ+ comments throughout the meeting during which it voted to remove the book. "Of course, the government rarely flatly admits it is engaging in viewpoint discrimination. In lieu of such evidence, plaintiffs may demonstrate viewpoint discrimination based on a pattern of enforcement that evinces a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." *Zukerman v. U.S. Postal Serv.*, 567 F. Supp. 3d 161, 174 (D.D.C. 2021) (cleaned up) (quoting *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018); *Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316, 331 (D.D.C. 2021)).

The Escambia County Board's anti-LGBTQ+ animus is evident from the circumstances and comments surrounding the Board's decision to remove *Tango*. For example: (1) the initial objection to *Tango* that led to the Board's review and ultimate removal of the book was that *Tango* promoted an "LGBTQ agenda using penguins," *see* Gay Decl., Ex. C, at 14; (2) the Board voted to remove *Tango* against

the recommendation of educational professionals and community members, including the District Materials Review Committee and the substantial majority of Escambia County elementary schools' Library Advisory Councils, *see id.* at 8–12, 41–62; Gay Decl., Ex. B, at 6; (3) Board member David Williams stated expressly that he voted—decisively, given that the vote was three to two—to remove *Tango* because "[t]he fascination is still on that it's two male penguins raising a chick," *see supra* n.6; and (4) the removal of *Tango* came alongside the removal of numerous other books with messages of tolerance for LGBTQ+ individuals—such as *Two Boys Kissing*, *All Boys Aren't Blue*, *Uncle Bobby's Wedding*, *Drama*, *When Aidan Became a Brother*, *Beyond Magenta*, and *Milo Imagines the World* from Escambia County public school libraries. Such a pattern of removals demonstrates intentional viewpoint discrimination. *See Zukerman*, 567 F. Supp. 3d at 174.

Because Fla. Stat. § 1001.42(8)(c)(3) and its application to *Tango* are viewpoint-discriminatory, they are *per se* unlawful. *Otto*, 981 F.3d at 870 n.12. *Tango* is factually accurate, non-vulgar, and non-obscene, and thus the only basis for the removal of this previously available book is Fla. Stat. § 1001.42(8)(c)(3) and the Escambia County Defendants' discrimination against the book's viewpoint. This likely renders the removal of the book *per se* unlawful.

At a minimum, the removal "depend[s] on what is said, [and thus is a] content-based restriction[] that must receive strict scrutiny," which it fails. *Otto*, 981 F.3d at 861. Strict scrutiny requires the government to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."

*Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (cleaned up). Even if the Escambia County Defendants invoke their "legitimate authority to protect children," that authority "does not include a free-floating power to restrict the ideas to which children may be exposed." *Otto*, 981 F.3d at 868 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011)). "So while protecting children is a crucial government interest, speech 'cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Id.* (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975)). The Escambia County Defendants' removal of *Tango* based on LGBTQ+ animus is flatly unconstitutional.

The Escambia County Defendants have not offered any explanation as to how removing students' access to *Tango* protects children. *See* Gay Decl., Ex. B. Nor can they: *Tango* is factually accurate, non-vulgar, and non-obscene. Richardson Decl. ¶ 9–11; Parnell Decl. ¶ 9–11; *see also* Gay Decl., Ex. A. Defendants' "majority preference" to remove access to otherwise age-appropriate content solely because it relates to LGBTQ+ issues and themes cannot justify the removal. *Otto*, 981 F. 3d at 869. "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

The removal of *Tango* is impermissible content- and viewpoint-discrimination that is *per se* unlawful and fails strict scrutiny. The Author Plaintiffs are thus highly likely to succeed on the merits of their claims.

**B.    The Student Plaintiff Is Likely to Show That the Removal of
*Tango* Violates Her Right to Receive Information**

In addition to violating the Author Plaintiffs' right to speak, the removal of

*Tango* infringes upon the Student Plaintiff's corollary "right to receive information

and ideas." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457

U.S. 853, 866–67 (1982) (plurality opinion) (quoting *Stanley v. Georgia*, 394 U.S.

557, 564 (1969)). "[S]tudents may not be regarded as closed-circuit recipients of

only that which the State chooses to communicate.... [S]chool officials cannot sup-

press 'expressions of feeling with which they do not wish to contend.'" *Pico*, 457

U.S. at 868 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,

511 (1969)).

And "the special characteristics of the school *library* make that environment

especially appropriate for the recognition of the First Amendment rights of stu-

dents." *Id.* Unlike a classroom, the materials in a school library are available for

students' voluntary reading and not part of a prescribed curriculum. *See Pico*, 457

U.S. at 869; Guillory Decl. ¶ 6. "[I]n light of the special role of the school library as

a place where students may freely and voluntarily explore diverse topics, [a] School

Board's non-curricular decision to remove a book well after it ha[s] been placed in

the public school libraries evokes the question whether that action might not be an

unconstitutional attempt to 'strangle the free mind at its source.'" *Campbell v. St.*

*Tammany Par. Sch. Bd.*, 64 F.3d 184, 190 (5th Cir. 1995) (quoting *W. Va. Bd. of*

*Educ. v. Barnette*, 319 U.S. 624, 637 (1943)).

School boards' discretion "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment" and "may not be exercised in a narrowly partisan or political manner" or used for the "suppression of ideas." *Pico*, 457 U.S. at 864, 870–71. School officials may restrict speech that would "undermine [a] school's basic educational mission," such as "vulgar and lewd speech," but they may not impose such restrictions based on "political viewpoint." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986).

Eleventh Circuit law is unsettled as to which of two standards governs "right to receive information" claims in school library book removal cases. The Eleventh Circuit has declined to decide whether the operative test is the standard applied to the removal of a school library book by the Supreme Court in *Pico*, 457 U.S. 853, or the standard for curricular speech outlined in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202. *Tango*'s removal is unconstitutional under either test. *Tango* has been made inaccessible because of the LGBTQ+-affirming viewpoint it expresses rather than for any legitimate pedagogical reason. Though Plaintiffs believe that *Pico* is the appropriate standard to apply in this case,[7] under either *Pico* or *Hazelwood*, the removal

---

[7] *Hazelwood* focused on "expressive activities ... [that] may fairly be characterized as part of the school curriculum," 484 U.S. at 271, but in the school library, students "can ... discover areas of interest and thought not covered by the prescribed curriculum," *Pico*, 457 U.S. at 869 (quoting *Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978)). Federal courts in the Eleventh Circuit have cited to *Pico* in discussing students' right to access materials in schools and have found "persuasive its characterization of the First Amendment right to receive information and ideas." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 2022 WL 16985720, at *12 (N.D. Fla. Nov. 17, 2022); *see also, e.g.*, *Virgil v. Sch. Bd.*, 862 F.2d 1517 (11th Cir. 1989).

of *Tango* by the Escambia County Board due to the book's LGBTQ+-positive viewpoint are unconstitutional.

Removing *Tango* violates the Student Plaintiff's right to receive information under *Pico*. A school board violates students' First Amendment right to receive information when it restricts students' access to materials in order to deny the students "access to ideas with which [the School Board] disagree[s]." *Pico*, 457 U.S. at 871. School boards cannot remove books simply because they dislike the ideas contained in them and seek, by the removal, to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *See Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202 (quoting *Pico*, 457 U.S. at 872).

The facts surrounding the Escambia County Board's decision to remove *Tango* under Fla. Stat. § 1001.42(8)(c)(3) reveals its motivation to use the intentionally vague and overbroad statute to remove books containing ideas with which the Board disagrees. The Board acted at the prompting of Ms. Baggett's challenge form that expressly cited an "LGBTQ agenda using penguins," "indoctrination," and H.B. 1557 as the basis for removing the book. Gay Decl., Ex. C, at 14, 16. Ms. Baggett further stated that she objected to *Tango* on the basis that, if students read *Tango*, "that idea would pop into [their] mind ... that these are two people of the same sex that love each other."[8] The Board also acted over the contrary

---

[8] Judd Legum, *Meet the Florida English teacher trying to ban 150 books from school libraries*, Popular Information (Dec. 20, 2022), https://popular.info/p/meet-the-florida-english-teacher [https://perma.cc/9R9F-VGE8].

determination of the majority of educational professionals and community members who weighed in. A decisive voter on the Board derisively referenced the book's two penguin fathers, and the Board removed *Tango* alongside numerous other books with LGBTQ+-affirming viewpoints. *Cf. Pico*, 457 U.S. at 870–71 ("If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books. The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration.").[9] Either the statute is viewpoint-discriminatory, the Board was viewpoint-discriminatory, or both. No matter which of these is the case, this viewpoint-based removal violates "[o]ur Constitution[,] [which] does not permit the official suppression of *ideas*." *Pico*, 457 U.S. at 871.

Removing *Tango* is unconstitutional under *Hazelwood* too. The *Hazelwood* test—which emerged in the context of classroom curriculum, not libraries—would arguably allow school boards curatorial control over the books in school libraries, but boards' curatorial decisions would still have to be "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273; *see also Virgil*, 862 F.2d at 1523 (applying *Hazelwood* test in context of school board's curricular

---

[9] Justice Rehnquist "cheerfully concede[d]" this point in his dissent, along with the proposition that school boards may not exercise their discretion over the content of school libraries in a "narrowly partisan or political manner." *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting).

decision to discontinue use of textbook it deemed sexually explicit and vulgar). This requires school boards "to provide legitimate reasons for limiting students' access to information." *Arce v. Douglas*, 793 F.3d 968, 982 (9th Cir. 2015) (citing *Virgil*, 862 F.2d at 1522).

The suppression of disfavored viewpoints is never a legitimate pedagogical reason for removing materials in public school libraries. *Hazelwood* does not "offer[] any justification for allowing educators to discriminate based on viewpoint" *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989). Under *Hazelwood*, the First Amendment "require[s] school officials to make decisions relating to speech which are viewpoint neutral." *Id.* (citing *Virgil*, 862 F.2d at 1522–23 n.6). In fact, citing *Searcey*, the Second Circuit has held that "a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate pedagogical interests." *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 633 (2d Cir. 2005).

There is no legitimate pedagogical basis for prohibiting access to *Tango*. Legitimate pedagogical reasons for removing student access to a book include that the book is factually inaccurate; contains obscenities, offensive language, vulgarity, or sexually explicit content; or is "psychologically or intellectually inappropriate for the age group." *Virgil*, 862 F.2d at 1521–22 (quoting *Pico*, 457 U.S. at 880 (Blackmun, J., concurring in part and concurring in the judgment)); *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202. None of these justifications applies to *Tango*. Richardson Decl. ¶¶ 10–11. *Tango* is not a "purportedly nonfiction book" that

"indisputably … contain[s] inaccuracies." *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1182, 1211. To the contrary, it is a fictional book[10] that is nonetheless based on real events and depicts them in a verifiably accurate manner. Parnell Decl. ¶¶ 5–7, 11.

Nor does *Tango* contain any "explicit sexuality [or] excessively vulgar language" that might justify the Board in keeping it out of the hands of younger students. *Virgil*, 862 F.2d at 1523; Parnell Decl. ¶ 10. The book is entirely appropriate for all age groups, including students in kindergarten through third grade. The book's publisher recommends *Tango* for young children, the same audience that the Board now prevents from accessing the book. Richardson Decl. ¶ 9. In fact, under the district's own process for reviewing library materials, educators overwhelmingly agreed that *Tango* had pedagogical value. Gay Decl., Ex. C, at 41–62. The Board does not have a legitimate pedagogical basis for removing *Tango* and thus its decision to do so based on the book's viewpoint is unconstitutional under *Hazelwood*.

Under either the *Pico* or the *Hazelwood* test, the Escambia County Board's non-pedagogical, viewpoint-discriminatory motive for removing *Tango* is plainly unconstitutional. The Student Plaintiffs are thus highly likely to succeed on the merits of their claim.

---

[10] *See* Gay Decl., Ex. C, at 5 (Escambia County's school library catalog using "Fiction" labels for *Tango*).

**II.**  **Plaintiffs Face Continuing Irreparable Harm from the Ongoing and Impending Injury to Their First Amendment Rights**

The injury to Plaintiffs, who are impeded from expressing themselves and receiving ideas, is irreparable *per se*. "[A]n ongoing violation of the First Amendment constitutes an irreparable injury." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) (quoting *FF Cosmetics*, 866 F.3d at 1298). Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also FF Cosmetics*, 866 F.3d at 1298 (same); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (same).

The ongoing violation of Plaintiffs' First Amendment rights necessarily entails continuing irreparable injury. *See Otto*, 981 F.3d at 870 (because plaintiffs in a free speech case were likely to succeed on the merits, "[t]hey also [met] the remaining requirements as a necessary legal consequence"). The Escambia County Defendants deployed H.B. 1557 to censor *Tango* on the basis of its viewpoint and content. Because the Escambia County Defendants stripped *Tango* of an essential part of its communicative value and limited the extent to which the Author Plaintiffs can speak through their book, the Author Plaintiffs have been injured in their exercise of their free speech rights since at least February 2023, when *Tango* was removed.

B.G. wants to read *Tango* and has specific plans to do so, but those plans have been foiled by the Escambia County Defendants' removal. Guillory Decl.

¶¶ 8–12. B.G.'s ability to receive information—namely, *Tango*'s wholesome story and message of tolerance—has been limited since February because of the Escambia County Defendants' suppression of *Tango*. *Id.*

Plaintiffs have been deprived of their First Amendment freedoms for more than six months and running—far more than the "minimal period[] of time" the Supreme Court described as sufficient for irreparable harm in *Roman Catholic Diocese*. 141 S. Ct. at 67. And because this harm continues and shows no sign of abating, Plaintiffs are suffering a *per se* irreparable injury that entitles them to preliminary injunctive relief. *See Speech First*, 32 F.4th at 1128.

## III. An Injunction Ending an Unconstitutional Deprivation of Rights Would Be Equitable and in the Public Interest

A preliminary injunction requiring the restoration of access to *Tango* satisfies the final two prongs of the applicable test: Enjoining the Escambia County Defendants' unconstitutional suppression of *Tango* is unquestionably in the public interest, and the Escambia County Defendants would suffer no damage from such an injunction. "When the nonmovant is the government, the third and fourth requirements [for a preliminary injunction]— 'damage to the opposing party' and 'the public interest'—can be consolidated" because "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [policy]." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 955 (11th Cir. 2022) (citing *Otto*, 981 F.3d at 870).

Vindicating Plaintiffs' First Amendment rights is in the public interest. The public has no legitimate interest in restricting protected, pedagogically valuable

speech on the basis of viewpoint. *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009); *LaCroix*, 38 F.4th 941 at 955; *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public … has no interest in enforcing an unconstitutional law."). Conversely, "it is *always* in the public interest to protect First Amendment liberties." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (emphasis added) (internal quotation marks omitted); *see Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("[T]he public interest is served when constitutional rights are protected."); *Speech First*, 32 F.4th at 1128 ("[T]he First Amendment, in particular, serves significant societal interests." (quoting *First Nat'l Bank of Bos. v. Belotti*, 435 U.S. 765, 776 (1978))). "[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury," *KH Outdoor*, 458 F.3d at 1272, and the Escambia County Defendants will not be damaged by a preliminary injunction because they have "no legitimate interest" in continuing their unconstitutional behavior, *id.*

The result would be the same even if Plaintiffs' claims had no constitutional dimension, because of *Tango*'s value to students and to the educational mission of public schools. *Tango* offers a factually accurate, wholesome story that teaches students about animal behavior and varied family structures, as well as values of tolerance and acceptance. Parnell Decl. ¶¶ 11, 14. The public interest is unquestionably served when schoolchildren in Escambia County are exposed to different points of view through a factually accurate, age-appropriate book such as *Tango*. If *Tango* were returned to the shelves of Escambia County school libraries, many children

would benefit, and no person (least of all the Escambia County Defendants) would suffer any harm. The balance of equities and the public interest strongly favor granting Plaintiffs the relief they seek.

The injury to Plaintiffs substantially outweighs any damage (there is none) that an injunction would cause to the Escambia County Defendants. *Tango* was a library book, not a part of any school curriculum. *See* Guillory Decl. ¶ 6; Gay Decl., Ex. C, at 8. The Escambia County Defendants would suffer no injury if an Escambia County student encountered *Tango* in a school library: The child would benefit from the book's educational content, and the Escambia County Defendants would not incur any pecuniary or other harm. But Plaintiffs have suffered a real harm because the Authors' speech cannot reach their intended audience, despite its pedagogical value to that audience, and because the Student Plaintiff cannot read *Tango* in her public school library. Because Plaintiffs have suffered and will continue to suffer a real harm absent an injunction and the Escambia County Defendants would suffer no harm from being enjoined, the balance of equities and the public interest favor the Plaintiffs.

No security is required for the requested injunction because the Escambia County Defendants would suffer no costs if wrongfully enjoined, and Plaintiffs have been deprived of a fundamental right. *See Complete Angler*, 607 F. Supp. 2d at 1335.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) and Local Rule 6.02, requiring the Escambia County Defendants to immediately restore students' ability to access *Tango* in Escambia County public school libraries and to maintain such access throughout the pendency of this action.

Dated: New York, NY
August 29, 2023

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By:    /s/     *Faith E. Gay*

Faith E. Gay (FBN 129593)
Lauren J. Zimmerman*
Max H. Siegel*
Masha Simonova**
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com
lzimmerman@selendygay.com
msiegel@selendygay.com
msimonova@selendygay.com

Anna T. Neill (FBN 100945)
William J. Blechman (FBN 379281)
KENNY NACHWALTER, P.A.
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: 305-373-1000
atn@knpa.com
wjb@knpa.com

*Counsel for Plaintiffs*

*(admitted *pro hac vice*)

**(application for admission *pro hac vice* pending)